No. 80,936

STATE OF KANSAS, *Appellee*, v. SHAKEER DAVIS, *Appellant*.
(998 P.2d 1127)

Opinion filed
March 10, 2000.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Brenda M. Jordan*, assistant county attorney, argued the cause, and *William E. Kennedy III*, county attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Shakeer Davis appeals his convictions for first-degree felony murder, attempted first-degree murder, aggravated robbery, and aggravated burglary in a shooting in Manhattan. The issues raised in this appeal concern: (1) a juvenile's participation in a court-ordered psychological evaluation in connection with a motion and hearing under K.S.A. 38-1636 to determine whether the juvenile is to be tried as an adult, (2) the determination of the voluntariness of a juvenile's confession, (3) and (4) admissibility of statements made after an ambiguous request for counsel and after

a previous *Miranda* warning, (5) the right to a unanimous verdict in an alternative means case, and (6) the propriety of an instruction on a lesser included offense. Upon review and for the reasons set forth below, we affirm.

On February 28, 1997, a shooting occurred which left Wanda Norman dead and John Garner wounded. The defendant, 17-year-old Shakeer Davis, was charged as a juvenile with first-degree premeditated murder, attempted first-degree murder, aggravated robbery, and aggravated burglary. The State filed a motion requesting that the trial court certify prosecution of the defendant as an adult.

At the certification hearing, Richard Coulter, the chief social worker at the Youth Center at Topeka (YCAT), testified regarding the defendant's suitability as an inmate. Coulter stated that the defendant could only be retained at YCAT until age 21 and that after that time he would be discharged regardless of rehabilitation. Coulter noted that the typical offenders at YCAT were in the 14- to 16-year-old range.

After reviewing a court-ordered psychological assessment of the defendant and the defendant's offense record, Coulter stated that while YCAT could maintain the defendant, it would be difficult to be optimistic about the prospects for the defendant to show a substantial positive change. Coulter stated that YCAT's programming is designed for adolescents and the defendant's psychological report stated that he had been functioning on his own for some time and viewed himself as an adult.

Dr. John Fajen, the psychologist who had performed the evaluation of the defendant, also testified. He stated that the purpose of the evaluation was to determine whether the defendant should be charged as a juvenile or an adult. His examination of the defendant totaled 5 to 6 hours with 1½ to 2 hours of time spent face to face with the defendant, and the remainder in testing. Dr. Fajen testified that the defendant was cooperative during the testing.

Dr. Fajen testified that the defendant stated he had a number of arrests and had committed numerous other crimes such as breaking and entering, car theft, high speed car chases, trespassing, theft, and shoplifting. The defendant was sent from New York to Kansas at age 15. The defendant reported that he had been smok-

ing marijuana since age 16 and had been involved in outpatient and inpatient counseling, which he found not to be helpful. Further, the defendant reported several suicide attempts. Dr. Fajen noted that the defendant did complete his General Equivalency Diploma.

According to Dr. Fajen, the defendant, while fairly competent to conduct himself appropriately, has shown significant errors in judgment. Dr. Fajen characterized the defendant as introverted and had difficulty interacting with people. Dr. Fajen stated that the defendant used others to meet his own needs without concern for the impact on the lives of the others that he used, and that he did not show remorse or accept blame. Further, according to Dr. Fajen, the defendant lived as an adult, keeping his own apartment and paying his own bills, and thought of himself as an adult. Dr. Fajen concluded that the defendant's history and attitude indicated that he was not amenable to treatment.

The defense moved to strike both the testimony of Dr. Fajen and the part of Coulter's testimony that relied on Dr. Fajen's report. The defense argued that the defendant's statements to Dr. Fajen were inculpatory and that Dr. Fajen had not notified the defendant of his *Miranda* rights prior to the examination. The trial court determined that it would not consider any inculpatory statements made with regard to the night of the incident but otherwise denied the motion. The court then addressed the required factors under K.S.A. 38-1636(e) and determined that the defendant should be tried as an adult. The defendant was eventually tried on an amended information charging him with alternative counts of first-degree premeditated murder and felony murder, as well as attempted first-degree murder, two counts of aggravated robbery, and one count of aggravated burglary.

Prior to trial, the defense filed a motion to suppress statements made by the defendant to police officers. At the hearing on the motion, the State presented the testimony of Howard Haile, a detective with the Riley County Police Department. Haile testified that prior to the defendant's questioning, the defendant was advised of his *Miranda* rights. Investigator Ryan Runyan of the Riley County Police Department stated that during the initial question-

ing, the defendant became unruly and stated that "maybe he needed an attorney." Runyan testified that at that point he and the other officers present left to allow the defendant to cool off.

Runyan testified that later he was walking back down the hallway after talking to another suspect when the defendant stuck his head out of the doorway and motioned to him. The defendant told Runyan that he needed a friend and wanted to tell the truth. Runyan sat down with the defendant and told him that if the defendant felt like he needed an attorney to let him know. The defendant told him that he had to tell the story. At the close of the hearing, the trial court denied the motion to suppress.

At trial, the State presented the testimony of Corey Bloom, a friend of victims Wanda Norman and John Garner. Bloom acknowledged that he, at the time of trial, was incarcerated for possession of cocaine. Bloom stated he had been introduced to the defendant at Garner's house and that he met with the defendant on February 23 and had loaned him $100 to get a friend out of jail. Bloom had taken the defendant's necklace as collateral for the loan. He told the defendant that when he paid back the money, he could pick up the necklace at Garner's house.

Bloom testified that he met with the defendant a few days prior to the murder, but the defendant did not have the money to redeem the necklace. On the day of the murder, Bloom called the defendant and demanded the money. According to Bloom, the defendant asked him not to sell the necklace and they argued. During the argument, the defendant told Bloom the defendant had a "9 millimeter with his name on it" and Bloom called the defendant a "punk nigger."

Christine Rhodeman, a girlfriend of the defendant's roommate, Duereal Campbell, testified as to the activities of the defendant and others on the day of the incident. She testified that she, the defendant, Campbell, and the defendant's sister, Delisha Branch, went to Salina in Branch's car in order to buy drugs. They went to a house in Salina where the group also obtained a gun. At some point, Branch asked the defendant about his necklace and the defendant told Branch that some "crackheads" had it. Branch then informed the group that they were going to get the necklace. The

group stopped at Branch's house in Ogden where Branch obtained a small red baseball bat. The group then went back to Campbell and defendant's apartment.

Rhodeman testified that at the apartment, Campbell cleaned the gun and Branch began to sharpen the tips of some of the bullets with a razor scraper. The defendant then dipped the bullets in alcohol. He told Rhodeman he was cleaning the fingerprints off of them. At this point, Rhodeman decided she did not want to be involved in what might occur later and had the group drop her off at a friend's house.

Campbell, 17 years of age, then testified. He confirmed Rhodeman's story about going to Salina, purchasing drugs, and obtaining a pistol. Campbell stated that he talked of going to Garner's house and giving him the money to redeem the necklace. However, according to Campbell, Branch insisted that the defendant fight Garner and take the necklace back.

Campbell also testified that when the group returned to the apartment, Branch used a paint scraper to sharpen the points of some bullets. Campbell stated that the defendant borrowed a pair of rubber gloves from him in order to use bleach to clean the bullets.

Campbell testified that the group went to Garner's trailer where he kept watch while the defendant and Branch left to purchase gloves and surgical masks. The defendant and Branch then put on the gloves and masks and the defendant unscrewed the bulb to the yard light. Campbell testified that the defendant then knocked on the door. When Garner answered, the defendant hit him. Garner then slammed the door. Branch, who had the gun, fired at the door. The group then kicked the door open. Once inside, the defendant and Garner squared off and began fighting. During the fight, the defendant handed Campbell the bat. At this time, Branch was standing behind Wanda Norman holding a paint scraper to her throat. Branch had given Campbell the gun.

During the fight, the defendant knocked something over. At this point, Branch let go of Norman and grabbed the gun back from Campbell. Campbell testified that the gun went off, shooting Garner in the torso. Norman ran for the kitchen and Branch grabbed

her by the hair and shot her in the back of the head. Branch then walked over to Garner and said something to the effect of "no witnesses," to which the defendant replied, "No, I'll do it." Campbell testified that at that point he left the trailer. Later, the defendant and Branch came back to the car and they drove to Ogden where they buried the gun. The defendant had Norman's purse in his possession when they left the trailer. Campbell testified that he later led police to the gun.

Garner's testimony regarding the incident differed slightly from that of Campbell. Garner testified that he lived in the trailer with Norman. On the night in question, he was getting ready for bed after spending the day drinking and using crack cocaine. Suddenly, he heard someone pounding on the door. Garner tried to turn on the outside light and look out the small window in the door but the light would not work. A small baseball bat then came through the window and hit him on the head. The defendant and two others entered. Garner acknowledged that he had purchased drugs from the defendant on previous occasions and that one time the defendant had sold him flour instead of cocaine.

The defendant again struck Garner with the bat and demanded his necklace. The necklace was not at Garner's trailer. Garner and the defendant were struggling when Garner believed he was shot in the neck. As Garner was laying on the floor, the defendant stood over him with a pistol. According to Garner, after the defendant shot him, Garner offered the defendant cash that he had in his pocket. The defendant took the money and shot him again. The defendant and the others then left and he saw Norman laying in a pool of blood. He asked her if she was going to be all right, to which she said "no."

Riley County police officers were dispatched to the trailer where they found Garner and Norman. Norman was dead when they arrived. Cause of death was a single .22 caliber gunshot wound which entered through the back of her neck and severed her carotid artery. Garner had suffered a bullet wound to the abdomen with the bullet resting near his spine. Garner also had multiple pellet wounds to his neck, upper chest, and jaw consistent with

being shot with a birdshot round. Garner told the police that "Shak" shot him.

Campbell lead police to the gun which was a .22 caliber Ruger MK 1 semi-automatic handgun. The clip in the gun contained four cartridges. A birdshot round casing was stuck in the gun, rendering it inoperable. Norman's purse, wallet, driver's license, and credit cards were found in Branch's rental car.

The doorknob to the trailer had been shot twice and a .22 caliber bullet fell out of the door when it was taken apart. A .22 caliber casing was found underneath Norman's body. Another was found in the living room and two more under the front porch.

The State then sought to introduce the testimony of Mark Bejot, who had been a youth care worker at the North Central Kansas Regional Juvenile Detention Center and had participated in the intake of the defendant. The defense objected on the grounds that any statements made to Bejot were without the benefit of *Miranda* warnings. A hearing was held during which Bejot proffered that he would testify that he asked the defendant to explain his arrest. The defendant told him he was charged with attempted murder. He asked the defendant why, and the defendant stated that two individuals had called him a "nigger" and he shot the man five times and the woman in the head. On another occasion, Bejot overheard the defendant say to others, "This is what I did" while the defendant was pointing his fingers like a gun. On another occasion, Bejot overheard the defendant stating to others that his sister had shot the girl in the head.

The trial court decided to allow the two overheard remarks on the grounds that they were not a result of interrogation. The trial court then found the remark made to Bejot admissible as a statement made after the defendant had received the prior *Miranda* warnings.

The defendant testified on his own behalf. He stated that he was from New York, his father had died when he was less than 1 year old, and his mother died of AIDS when he was 8. The defendant acknowledged getting into trouble with law enforcement, which led to him getting sent to Kansas to live with his sister.

The defendant testified that the group went to Salina to buy drugs and obtain a gun. He stated that he cleaned the gun at the apartment because it was corroded and used bleach to clean some corrosion off of the bullets. According to the defendant, he spilled some bleach on his pants and went to change them. When he came back, the gun was gone.

The defendant testified that earlier in the day he had a heated telephone conversation with Corey Bloom. During that conversation, he had also talked to Garner, who was mad at him because the defendant had sold Garner some fake cocaine.

The defendant acknowledged going to Garner's house and stated that he unscrewed the outside light. He further acknowledged that his sister, Branch, had purchased gloves and a mask at a nearby grocery store. According to the defendant, when Garner answered the door, they argued about the fake cocaine. Garner called the defendant a "damn nigger" and the defendant hit him with a small baseball bat. The defendant testified that it was Campbell, not Branch, who shot at the door, and then kicked it open. A fight ensued, during which the defendant heard a shot. He then heard another shot and Garner slumped to the floor. He then left. The defendant testified that his sister later told him that Campbell had shot Norman. The defendant denied ever handling the gun that night. When asked to explain the remarks he made to Bejot during the intake processing, the defendant maintained that he was just being "sarcastic."

Following deliberations, the jury found the defendant guilty of first-degree murder under a combined premeditated-felony theory. The defendant was also found guilty of attempted first-degree murder, one count of aggravated robbery of Norman, and one count of aggravated burglary. The defendant was acquitted of the aggravated robbery of Garner.

I. *Juvenile's participation in a court-ordered psychological evaluation in connection with motion and hearing under K.S.A. 38-1636 to determine whether juvenile is to be tried as an adult.*

In connection with the determination of whether the defendant, age 17, would be tried as an adult, the trial court ordered a psy-

chological examination. The defendant argues that the trial court erred in denying his motion to strike statements he made to the court-appointed psychologist, Dr. Fajen, during the course of the examination. More specifically, the defendant contends that the statements were made without the benefit of *Miranda* warnings and should not be used against him as the psychologist's evaluation was the equivalent of custodial interrogation.

The parties agree that the stated purpose of the evaluation was to determine whether the defendant should be charged as a juvenile or an adult. Dr. Fajen's examination of the defendant totaled 5 to 6 hours, with 1½ to 2 hours of time spent face to face with the defendant and the remainder in testing. The defendant was cooperative during the testing. There is general agreement and the record supports a conclusion that the information derived from the examination and the testimony of Dr. Fajen aided the court on the issue of certification.

In advancing his argument, the defendant relies upon the case of *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981). *Estelle* involved the question of whether reversible error occurred in the penalty portion of a death case where the State used the unwarned statements of the respondent to a psychiatrist during a court-ordered competency examination as evidence in the sentencing proceeding. The United States Supreme Court held the fact that "respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney is 'immaterial," because the respondent was " 'faced with a phase of the adversary system' and was 'not in the presence of [a] perso[n] acting solely in his interest.' " 451 U.S. at 467. In so finding, the Court stated:

"When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." 451 U.S. at 467.

Thus, the Court found that the use of the unwarned statements violated the respondent's Fifth Amendment rights.

We note that there is a difference between *Estelle* and the case we now consider. The problem in *Estelle* is that the statements made during the competency evaluation were used for a different purpose; that is, to establish the respondent's future dangerousness at sentencing. The Court noted that had the application of the statement been confined to the determination of the respondent's competency, no Fifth Amendment issue would have arisen. 451 U.S. at 465. In the case we now consider, the defendant's statements to Dr. Fajen were used for their intended function, which was to establish whether the defendant should be tried as an adult. However, the rationale of *Estelle* still applies.

Other courts have not been consistent in resolving the application of *Estelle* to evaluations for juvenile waiver proceedings. See *R.H. v. State*, 777 P.2d 204 (Alaska App. 1989); *People in Interest of A.D.G.*, 895 P.2d 1067 (Colo. App. 1994); *Commonwealth v. Wayne W.*, 414 Mass. 218, 606 N.E.2d 1323 (1993); *People v. Hanna*, 443 Mich. 202, 504 N.W.2d 166 (1993). In *R.H.*, the Court of Appeals of Alaska determined that a juvenile's Fifth Amendment right was violated by a court order compelling him to submit to a psychiatric evaluation where that evaluation was used as evidence in a waiver hearing. 777 P.2d at 211. In reaching this determination, the court considered the argument that the examination could be used for the purpose it was ordered and rejected it, noting:

"We find the state's argument unpersuasive, for there are vast and fundamental differences between competency proceedings and juvenile waiver hearings. In holding that court-ordered psychiatric examinations are permissible for purposes of determining competency to proceed, the Court in *Estelle v. Smith* characterized such examinations as being conducted for 'limited, neutral purposes.' (Citation omitted.) The Court distinguished the use of examinations for such purposes from their use in an 'adversary system,' by persons who are not 'acting solely in [the] interest' of the accused. (Citation omitted.)

"In contrast to competency proceedings, juvenile waiver hearings are hardly 'neutral proceedings.' Rather, they are fully adversary proceedings in which the burden of establishing a child's probable unamenability to treatment is formally allocated to the state. Similarly, a psychiatrist conducting an examination at the request of the state for use in such cases is hardly a person 'acting solely in the interest' of the child. To the contrary, the psychiatrist is directly involved in furthering the interests of the child's formal adversary." 777 P.2d at 210.

The courts in *A.D.G.* and *Wayne* agreed with the above reasoning and concluded that court-ordered examinations for the purpose of waiver hearings in juvenile proceedings violate the juvenile's Fifth Amendment rights. See *A.D.G.*, 895 P.2d at 1072-73; *Wayne*, 414 Mass. at 229-230. Both courts, as well as the Alaska Court of Appeals, would make an exception where the juvenile seeks to present psychiatric evidence from the examination at the certification hearing. *R.H.*, 777 P.2d at 211-12; *A.D.G.*, 895 P.2d at 1072-73; *Wayne*, 414 Mass. at 230-32.

On the other hand, the Supreme Court of Michigan expressly rejected the reasoning employed in *R.H.*, *A.D.G.* and *Wayne*. *Hanna*, 443 Mich. at 219. *Hanna* concluded that the reasoning failed to adequately consider the history of juvenile proceedings and under Michigan law, the waiver hearing process was a special proceeding. 443 Mich. at 219 n. 52. Michigan law provides a bifurcated process where phase I is a standard preliminary hearing and phase II is to determine whether the interests of the state and the juvenile warrant trial as an adult. The court noted that "[a]lthough the burden of providing that a juvenile should be sentenced as an adult is on the prosecutor, MCR 6.931(E)(2), 'all relevant and material evidence may be received by the court and relied upon to the extent of its probative value, even though such evidence may not be admissible at trial." 443 Mich. at 224.

None of the above jurisdictions deal directly with the question raised by the defendant in this case, which is whether *Miranda* warnings are required to be given to a juvenile defendant during the court-ordered examination. The very nature of the court-ordered examination and a juvenile's participation in the examination does not easily lend itself to an application of *Miranda*. The purpose of the examination is to determine whether the juvenile should be afforded the protection of the juvenile justice system or instead be certified to stand trial as an adult. *Miranda* warnings would be particularly useless in this regard, as a juvenile's ability to pick and choose which questions to answer would frustrate the purpose of the evaluation. It seems to this court that the application of *Estelle* to an order for a psychological evaluation in a juvenile certification case involves the question of whether the juvenile

must participate in the court-ordered evaluation rather than the question of whether the juvenile must be given warnings prior to and during participation.

In *R.H.*, the court recognized the futility of *Miranda* warnings in the context of a psychological evaluation. 777 P.2d at 208-09. The court in *R.H.* concluded that even though the respondent juvenile had been provided with procedural safeguards to protect his right against self-incrimination, including having an attorney present during the examination to object to any questions which might implicate that right, such safeguards were still not sufficient because the examination itself was a violation of the juvenile respondent's rights. 777 P.2d at 210-11.

The question of whether a juvenile should be required to participate in such psychological evaluation depends upon how one views the proceeding to determine whether the juvenile should be certified as an adult for purposes of trial. Kansas has recognized that certification proceedings are " 'comparable in seriousness to criminal prosecution' " and must comply with the essentials of due process and fair treatment. *In re Edwards*, 227 Kan. 723, 725, 608 P.2d 1006 (1980). Thus, the process in Kansas is adversarial in nature, and the burden is on the State to show that the juvenile should be prosecuted as an adult. We agree with the reasoning expressed in *R.H.* and *A.D.G.* and hold that a juvenile has the right under the Fifth Amendment of the United States Constitution to refuse to participate in a court-ordered psychological examination pursuant to a pending proceeding to determine whether the juvenile is to stand trial as an adult. The fact of refusal may not be admitted against the juvenile.

However, under the facts of this case, the defendant was not compelled to participate in the psychological examination. Rather, the record establishes that the defendant's counsel approved the psychological evaluation in the hope that it would aid his client. Counsel for the defendant recognized that the psychological evaluation order would aid the court in its final decision on the question of certification and stated, "Given that choice, the election was made by me in approving that order that the psychological evaluation should go forward." It was only after the evaluation when

certain responses of his client regarding past criminal behavior and that Dr. Fajen "veered into an area wherein he put in jeopardy the future of Shakeer Davis in terms of his ability to be treated as a juvenile" that the defense counsel moved to strike the testimony of Dr. Fajen because no *Miranda* warnings had been given.

We have no hesitancy in concluding on the record before us that the defendant's participation in the evaluation itself was voluntary. Consistent with our holding today, once the choice was made to submit to the examination, and the results of the examination were to be used exclusively in the certification determination, there was no further need for *Miranda* warnings. It would be a different situation if the State had attempted to use statements made by the defendant during the evaluation at trial. In such a situation, consistent with *Estelle, Miranda* warnings would have been necessary to permit such statements to be admitted at trial. However, in this case the evaluation was used for its intended purpose. Thus, the trial court did not err in considering either the testimony of Dr. Fajen or the testimony of Coulter based on Dr. Fajen's evaluation.

## II. *Juvenile confessions—determination of voluntariness.*

Statements made by the defendant to the police were admitted into evidence over objection at the defendant's trial. The defendant argues that the trial court failed to consider factors mandated by this court in *State v. Young*, 220 Kan. 541, 552 P.2d 905 (1976). *Young* provides that in determining whether the confession of a juvenile is voluntary, factors to be considered include: (1) the age of the minor, (2) the length of the questioning, (3) the minor's education, (4) the minor's prior experience with the police, and (5) the minor's mental state. See 220 Kan. at 546-47.

The court in this case made the following findings with regard to the motion to suppress:

"Well, the Court, having heard the testimony, would make the following findings for the purposes of the motion to suppress. First of all, that the defendant was given his *Miranda* rights and warnings, and that I do believe that he understood those, and in fact, he signed a written waiver of those rights. At some point in time through the interrogation process the defendant made a statement that maybe he should speak with an attorney. At that point, it's the Court's findings that the officer stopped questioning, and I would take that to mean by their actions

that they thought the defendant was requesting to speak with an attorney. At least it created enough doubt in their mind that they needed to stop questioning at that time, which the testimony is uncontroverted they did.

"The Court would also find that later on that same evening or morning hour of March 1st, that the defendant then initiated, on his own, further discussion with the police, and pursuant to the *State v. Bailey* case, 256 Kan. 872, when the defendant does initiate further discussion, and it's uncontroverted, and my findings are that he did initiate further discussion, that the police are entitled to further question the defendant, with the second part of the test being that the accused knowingly and intelligently waived his previously asserted rights.

"The officer's uncontroverted testimony is that he gave him at least two opportunities after the defendant initiated his discussion to once again invoke the right to an attorney. Although his answer was—would better have been that he was waiving that right, it was very clear from his actions and from his statements that that was his intent, and at the time that he initiated it, and requested to talk to the officer, and in fact did talk to the officer, that he still was aware of his Miranda rights, and the officer had reminded him of that.

"Therefore, I will deny the defendant's motion to suppress those statements."

Contrary to the defendant's assertion, this court has not required that a trial court explicitly consider the *Young* factors on the record in determining voluntariness. We have, however, strongly suggested that the factors be considered and have in the past chastised trial courts for failing to make such findings with regard to certain of the factors. See, *e.g.*, *In re B.M.B.*, 264 Kan. 417, 424-25, 955 P.2d 1302 (1998). However, where the trial court has made a finding that the accused's statements were voluntary, this court's standard on review is whether the trial court's findings are based on substantial evidence. See *In re B.M.B.*, 264 Kan. at 423.

Where, as here, the accused is a juvenile, this court exercises the greatest care in assessing the validity of the confession. *State v. Robinson*, 261 Kan. 865, 888, 934 P.2d 38 (1997). In determining whether a confession is voluntary, consideration is given to the totality of the circumstances and great reliance is placed upon the finder of fact. 261 Kan. at 888. Having advised trial courts to consider the *Young* factors and recognizing that in this case the trial court completely failed to address any of those factors, this court is faced with a difficult decision. Reliance upon the finder of fact in this case does not provide much comfort since the court did not even mention the *Young* factors. At the same time, however, our

determination on appeal is not limited to the findings of the trial court. Instead we are governed by the totality of the circumstances as determined from the record in deciding whether the defendant's statements were voluntary. However, we again stress that the better practice for a trial court when faced with determining the voluntariness of a juvenile confession or statement is to explicitly consider the *Young* factors in making its determination.

Applying our standard of review, we are satisfied that under a totality of circumstances, the defendant's statements were voluntary and properly admitted by the trial court. The defendant was 17-years-old, lived independent of any adult, and functioned as an adult. While the length of time the defendant spent at the police station was considerable, some 4 to 6 hours, he was not questioned continuously during that time and was allowed food and drink and to speak to his sister. The defendant had obtained his G.E.D., had a large amount of prior experience in dealing with law enforcement officers, and was not upset or under any apparent mental strain. The record, together with the findings of the trial court, supports the trial court's admission of the defendant's statements.

III. *Admission of juvenile's statements made after ambiguous request for counsel.*

The defendant also argues that the trial court erred in admitting his statements because he made the statements following a request for counsel. He argues that where a juvenile makes an ambiguous request for counsel, law enforcement officers should not question the juvenile until provided with counsel or at the very least, should attempt to clarify whether the juvenile intended to assert his or her right to counsel.

This court, consistent with the United States Supreme Court, has determined that where an accused has expressed his or her desire to be represented by counsel, the accused may not be subjected to further interrogation until counsel has been provided unless the accused initiates further communications. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); *State v. Copridge*, 260 Kan. 19, 25, 918 P.2d 1247 (1996). Where an accused makes a statement which may be ambiguous as

to whether the accused is asserting a right to confer with counsel, the interrogator may ask questions to clarify but is not required to do so, and the questioning may continue. *State v. Speed*, 265 Kan. 26, 37-38, 961 P.2d 13 (1998).

In this case, the defendant's statement that "maybe he needed an attorney" was ambiguous and the officers could have continued questioning. Instead, the officers chose to treat the statement as a request for counsel and terminated the interrogation. A short time later, the defendant voluntarily initiated further conversation and he was again advised that he could ask for an attorney. While acknowledging *Edwards v. Arizona* and this court's holding in *Copridge*, the defendant argues that the standard should be different for juveniles in that officers should be required to clarify an ambiguous request concerning counsel and to cease questioning in any event until an attorney is provided. We see no need to adopt such a standard and have in the past applied the normal standard to individuals as young as 14. See *State v. Robinson*, 261 Kan. at 885-88.

Under the circumstances of this case where the officers terminated the interrogation upon an ambiguous request for counsel, and the defendant soon after initiated further conversation and was advised of his rights at that time, the trial court did not err in determining that the defendant's statements were voluntary and should be admitted.

IV. *Juvenile's statements made to a juvenile detention worker after previous Miranda warning.*

The fourth issue raised by the defendant is his contention that the trial court improperly admitted statements made by him to a juvenile detention worker, Mark Bejot, during the intake process at the detention facility. The sole focus of the defendant's contention is on the statements he made in response to Bejot's question as to why the defendant was arrested. The defendant told Bejot he was charged with attempted murder. Bejot asked the defendant why, and the defendant stated that two individuals had called him a "nigger" and he shot the man 5 times and the woman in the head. Bejot claimed that this was a routine question on the intake ex-

amination, and he wanted to make sure the defendant understood the charges against him.

A *Miranda* warning must be given prior to any type of custodial interrogation. *State v. Clemons*, 251 Kan. 473, 480, 836 P.2d 1147 (1992). The requirements of *Miranda* apply when an accused is interrogated by law enforcement officers or their agents. See *State v. Pursley*, 238 Kan. 253, 259-60, 710 P.2d 1231 (1985).

The record shows that the defendant was last advised of his rights by Detective Shuck at 5:44 a.m. in Manhattan. He was then taken to Junction City where Bejot began the intake process at 12:13 p.m. and the defendant made the statement in question. In *State v. Boyle*, 207 Kan. 833, 841, 486 P.2d 849 (1971), we held that once the mandate of *Miranda* is complied with at the threshold of the interrogation by law enforcement officers, the warnings need not be repeated at the beginning of each successive interview. While Kansas has not addressed the exact issue involved here, other courts have held that the mere passage of time between *Miranda* warnings and interrogation need not render a confession inadmissible. See *State v. Trostle*, 191 Ariz. 4, 14, 951 P.2d 869 (1997); *State v. Rowe*, 479 A.2d 1296, 1299 (Me. 1984). Further, the mere fact that different law enforcement officers were doing the questioning does not make the confession inadmissible. See *Mainor v. State*, 259 Ga. 803, 804-05, 387 S.E.2d 882 (1990).

This case represents a closer question. We are faced with a juvenile defendant who had already given his confession and was then taken to a detention center in a separate location where he was again asked questions, not by a police detective, but by a detention center worker. However, given his experience with law enforcement officers and looking at the totality of the circumstances, we conclude that the trial court did not err in finding the defendant's statements to Bejot admissible.

V. *Right to a unanimous verdict in an alternative means case.*

The defendant argues that he was denied his right to a unanimous verdict. He contends that the evidence to convict him of first-degree premeditated murder was insufficient so that his conviction

on the combined theories of felony and premeditated murder cannot stand.

In *State v. Grissom*, 251 Kan. 851, 891, 840 P.2d 1142 (1992), we held that a general verdict of first-degree murder could be upheld if there was sufficient evidence to convict the defendant of either first-degree premeditated murder or felony murder. Under the reasoning of *Grissom*, it would not matter whether sufficient evidence to convict the defendant of premeditated murder existed as long as sufficient evidence existed to convict the defendant of felony murder.

However, the *Grissom* rationale is questionable in this case. The verdict in *Grissom* was a general one of guilty of first-degree murder. In finding that the State did not have to establish sufficient evidence for both premeditated and felony murder, this court quoted *Griffin v. United States*, 502 U.S. 46, 59-60, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), for the proposition that jurors are well equipped to analyze the evidence and where one of the possible bases for conviction is without sufficient evidence, the jurors' intelligence and expertise would save them from relying on it. 251 Kan. at 892. In this case, the jury was not given a general verdict form. Rather, the verdict form returned by the jury explicitly stated that the jury was unable to unanimously agree on either a premeditated or felony-murder theory and, thus, found the defendant guilty under the combined theories.

Unlike *Grissom*, the verdict form in this case is more properly analyzed under the alternative means rule discussed in *State v. Timley*, 255 Kan. 286, 288-90, 875 P.2d 242 (1994). In that discussion, this court quoted *State v. Kitchen*, 110 Wash. 2d 403, 756 P.2d 105 (1988):

> " 'In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]' " 255 Kan. at 289.

We also quoted *Grissom* for the proposition that " '[i]f an accused is charged in one count of an information with both premeditated murder and felony murder, it matters not whether some members of the jury arrive at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilt by reason of the killer's malignant purpose.' " 255 Kan. at 290.

Consistent with *Timley*, we conclude that there is sufficient evidence by which a reasonable jury could have found the defendant guilty of felony murder. The defendant admits as much. There was also sufficient evidence from which a jury could find that the defendant was guilty of aiding and abetting first-degree murder. In *State v. Wakefield*, 267 Kan. 116, 977 P.2d 941 (1999), the question was whether Wakefield could be convicted of first-degree premeditated murder even though he did not actually commit the killing. The evidence showed that Wakefield and a friend had broken into a home and taken numerous items and that Wakefield's friend had gone upstairs after stating that he was going to "take care of" the occupants. We stated:

"It is well established in Kansas law that the mere presence of an accused at the time and place of the crime alleged is not sufficient to make the accused guilty of the crime, but if from the facts and circumstances surrounding the defendant's presence at the time and from the defendant's conduct it appears that the defendant's presence did in fact encourage someone else to commit the criminal act, guilt may be inferred. *State v. Smolin*, 221 Kan. 149, 153, 557 P.2d 1241 (1976). In the absence of anything in a person's conduct showing a design to encourage, incite, aid, abet, or assist in the crime, the trier of facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that the person assented to the commission of the crime, lent his or her countenance and approval thereto, and thereby aided and abetted the commission of the crime. 221 Kan. at 153." 267 Kan. at 121.

The evidence in this case shows that the defendant's sister, Delisha Branch, killed Wanda Norman. There is evidence that Branch then told the defendant that there should be "no witnesses," and the defendant then shot Garner in an attempt to silence the witness to the killing, thus aiding in the commission of the crime. The jury was properly instructed that a person who intentionally aids and abets the commission of a crime is responsible for any other crime

committed in carrying out the intended crime as long as the other crime was reasonably foreseeable. The jury could properly have found the murder to be a reasonably foreseeable consequence of the attempt to take back the necklace. Further, the jury could have found that the defendant's plan included taking back the necklace and killing any witnesses. The defendant's participation in the illegal entry, coupled with his actions in fighting Garner and his apparent approval of attempting to kill Garner so as to not leave any witnesses, provides sufficient evidence from which a jury could conclude that he aided and abetted in the premeditated killing of Norman. Under these circumstances, the defendant was not deprived of his right to a unanimous verdict.

VI. *Necessity to instruct on the lesser included offense of attempted second-degree murder.*

The defendant's final argument is that the trial court erred in failing to instruct the jury on the crime of attempted second-degree murder as a lesser included offense of attempted first-degree murder. The trial court has the affirmative duty to instruct the jury on all lesser included offenses established by the evidence, even if weak and inconclusive. *State v. Ordway*, 261 Kan. 776, 784, 934 P.2d 94 (1997). However, an instruction on an included offense is not proper if, from the evidence, the jury could not reasonably convict of the lesser offense. *State v. Robinson*, 261 Kan. 865, 883, 934 P.2d 38 (1997).

The defendant argues that the jury could have found that he shot Garner attempting to kill him but without premeditation and, therefore, could have convicted him of attempted second-degree murder. However, the only evidence regarding the defendant's shooting of Garner is Campbell's testimony that the defendant took the gun from his sister and said, "No, I'll do it" and then shot Garner; or Garner's testimony that the defendant stood over him with a gun, shot him, took money from him, and then shot him again. Either version is inconsistent with a finding that the defendant attempted to kill Garner without premeditation. As a result, the trial court did not err in failing to instruct on attempted second-degree murder.

Affirmed.