No. 83,480

STATE OF KANSAS, *Appellee*, v. DANIEL RAMOS, *Appellant*.

(24 P.3d 95)

Opinion filed June 1, 2001.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Daniel Ramos appeals his convictions for first-degree felony murder, criminal discharge of a firearm at an occupied dwelling, and criminal possession of a firearm. K.S.A. 21-3401; K.S.A. 2000 Supp. 21-4219(b); K.S.A. 2000 Supp. 21-4204(a)(3).

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a conviction resulting in a life sentence receives automatic review by this court).

The issues are whether the district court erred by: (1) denying Ramos' motion to suppress his statements made during a custodial interrogation, (2) imposing consecutive sentences, and (3) permitting the prosecutor's closing remarks.

Finding no error, we affirm.

## FACTS

Ramos was 16 years old when arrested. His parents separated when he was in 8th or 9th grade. He was essentially unsupervised by his mother. He left his mother's home to live with his father; then he ran away from his father's home. Ramos became an itinerant houseguest, living with one friend after another. In the fall

of 1997, he lived with Jaime Valdez and Jaime's cousin Saul Hernandez.

Valdez and several of his cousins and associates were members of the "Central Thirteen" or "C-13's" gang. Membership in the C-13's included Valdez' cousins, Saul Hernandez, Roy Garcia, and Israel Casares, and their friend Paul Scheina. The C-13's were enemies of the "Spanish Disciples" or "Folks." Brandon Parker and George Manning III were members of the Spanish Disciples gang.

Manning had known Valdez, Hernandez, Casares, and Scheina for years. He fought with Scheina once but with Casares on a regular basis. The gang conflict escalated beyond school yard fights. Hernandez described Manning as an enemy. He said, "We shoot at each other a lot." According to Manning, both the police and Garcia suspected that Manning, Parker, and another friend "shot up" Garcia's house. A couple of days before the drive-by shootings, Parker and Manning had called Valdez and bragged about shooting his house. Scheina testified that Parker shot at him the day before.

On the afternoon of January 13, 1998, Hernandez stole a 1989 Ford Taurus. Hernandez saw Ramos on the corner and told him to get into the car. When Ramos asked, "Whose car is this?" Hernandez told him not to worry about it. The two young men drove to Valdez' house. An older cousin got some beer for them, and they got drunk. Valdez, Hernandez, and Ramos smoked marijuana and listened to the radio. Later, Casares and Garcia joined them. Hernandez passed out before midnight and testified that he did not know what happened after that.

Ramos decided to visit his girlfriend. Casares agreed to go along. Casares asked Ramos where the car was. Ramos said they had parked it one street over, and Casares said, "[C]ome on, let's go get in the car, [and] go somewhere." Ramos agreed, and they went to Garcia's house, where they picked up Scheina. Ramos noticed that Casares had an SKS rifle.

Ramos testified that in the early morning hours of January 14, 1998, Casares and Scheina started talking about going to someone's house. Ramos testified that he did not want to go and tried to convince Casares to "chill out." Ramos said Casares pressured him to go along, calling him names, like "little bitch," until he agreed

to go with them. Scheina drove to the home of Parker's grandmother, Janet Krulic, where Parker sometimes lived. Ramos testified that Scheina and Casares got out of the car and shot at the house. Ramos said he stayed in the car.

Scheina also testified that: (1) he and Casares did all of the shooting at the Krulic house, (2) Ramos stayed in the car, (3) Ramos did not want to go to the Krulic house, but he and Casares pressured him to go, and (4) Ramos was pulled into the conflict between the C-13's and the Spanish Disciples because he was hanging around with the C-13's.

The events of the evening led to a second shooting at the Mannings' house and a third shooting at a house on Central Street. After the shooting on Central Street, the young men returned to Garcia's house. Ramos testified that he and Valdez wanted to go home. Scheina refused to drive because of what had happened. Garcia took the keys. Ramos and Valdez left with him to go home. Garcia testified that they had guns, the SKS rifle, and a .410 gauge shotgun with them. Garcia was driving and Ramos was in the front passenger seat.

Garcia testified that he decided he wanted to go by the Mannings' house again because George Manning had previously threatened Garcia's aunt with a gun. Garcia stopped to let Ramos and Valdez out; however, he heard gunshots and drove away. Ramos and Valdez stayed in the car. Garcia said he did not see Ramos with the SKS rifle and never saw him shooting it.

Ramos testified that Garcia was not going the right way to take them home, and they ended up at the Mannings' house. He said Valdez shot out the back window of the car with the SKS rifle, but neither he nor Garcia shot at the house.

Valdez contradicted Ramos and testified that at the Mannings' house, Ramos leaned out of the car, over the hood, and shot the SKS rifle. Valdez admitted that he shot the .410 out of his car window. He said he shot at the Mannings' house because "they" shot at his house. He did not know whether any of Ramos' shots hit the house, and he admitted that Ramos could have been firing in the air.

A neighbor testified that this shooting happened about 3:20 or 3:30 a.m. After she heard the shots, she got dressed and went to the Mannings' house. One of the Manning boys was running down the street, screaming, "They killed my mother." An officer at the scene heard George Manning say, "I got my mamma killed." Mrs. Manning had stayed up and watched television in the living room after the first drive-by shooting that evening. Her family found her lying on the floor after the second shooting. She died from a gunshot injury to her face.

The C-13's, still in the stolen car, were stopped by the police soon after the second Manning-house shooting. Ramos and Valdez got out of the car and ran. Garcia, the driver, stayed by the car. The police found an SKS semiautomatic rifle in the front seat and a single shot shotgun in the back seat. The bullet fragments in Mrs. Manning's head were tested and determined to have been fired by the SKS rifle. Ramos was identified as the person who ran from the front passenger side of the car. Valdez, 14 years old, was identified as the passenger in the back seat.

Officer Goehner testified that he tackled Ramos and cuffed his hands behind his back. Once Ramos was caught, he was put in a police van. The officer described Ramos as tired, weak, sweating, and bleeding from his mouth and right ear. When asked if he was under the influence of alcohol or drugs, Ramos said, "Yes." He had trouble walking and standing.

The police brought Ramos to the detective bureau at around 4:05 a.m. He remained in handcuffs. Officer Angell testified that Ramos was a "youth" or juvenile. As Ramos waited in a chair, he tried to sleep, but when he dozed off, officers would wake him. Interrogation began around 10:50 a.m. Detective Allen testified that he interviewed Ramos. He described him as well-mannered, polite, and nervous. Ramos was not given any food. He seemed to be sober. Allen read Ramos his *Miranda* rights. Ramos signed the form on which he said that he understood his rights and consented to talk to the police.

Detectives Allen and Golubski spoke to Ramos about 20 minutes concerning the events of the previous evening before turning on the tape recorder. Detective Allen wanted to hear what Ramos was

going to say before he turned on the recorder. At trial, Ramos' taped statement was played for the jury.

Ramos' accounts of events were inconsistent. He told the detectives that he shot at the Krulics' house. At trial, he said Scheina did that shooting and that he had not used any weapons himself. In his taped statement and at trial, he said Casares shot at the Mannings' house the first time. Ramos admitted in his taped statement to shooting at the house on Central Street, but he denied that shooting at trial. He told the detectives that he and Valdez both shot at the Mannings' house the second time, but at trial he denied participating in the shooting. Ramos said he lied to the detectives because he "wanted to be cool."

According to Ramos, when the detectives started questioning him about the drive-by shootings before recording, he first told them that he was not there and did not know anything. However, he finally admitted that he was there. Ramos testified that the detectives told him that Valdez and Garcia had told them he was responsible for the shooting. He testified that he did not want to "snitch" on Valdez and Garcia and thought they should all have the same story, so he agreed that he was responsible.

Ramos testified that the detectives gave him the details of what happened, and then he agreed with them and repeated the details on tape. According to Golubski, the detectives interviewed Ramos about what happened off tape, and there was no recording of that interview. Golubski testified that he and Allen did interrogate Valdez and Garcia before they questioned Ramos, but he denied telling Ramos what Valdez and Garcia had said.

The detectives started the recorder and advised Ramos of his rights. Ramos said they were going to review everything he had already told them and record his statement, but he asked for an attorney after the recorder was turned on. The detectives stopped the questioning. Golubski testified that at that time, Ramos asked what the other participants had done. Golubski told Ramos that the others had provided a statement. Ramos agreed to waive his right to an attorney and to let the detectives tape his statement.

## DISCUSSION
### Ramos' Motion to Suppress

Ramos argues that the district court erred by denying his motion to suppress his statement made to detectives during the custodial interrogation. He contends that the district court failed to consider the relevant factors in determining whether his confession, as a juvenile, was voluntary, and he also contends that his Fifth Amendment right to counsel was violated.

We first consider the claim that Ramos' confession was involuntary. Ramos was almost 17 years old at the time of the questioning. We have established factors to be considered in determining whether the confession of a juvenile is voluntary: "(1) the age of the minor, (2) the length of the questioning, (3) the minor's education, (4) the minor's prior experience with the police, and (5) the minor's mental state." *State v. Davis*, 268 Kan. 661, 674, 998 P.2d 1127 (2000). The district court need not explicitly consider these factors on the record, but the better practice is to do so. Where an examination of the record shows that under the totality of the circumstances, the juvenile's confession was voluntary, the district court's decision will not be overturned on appeal. 268 Kan. at 675.

At the suppression hearing, the district court heard the testimony of Detectives Allen and Golubski, Santana Spurlock, who had been held at the same juvenile detention center, and Ramos. Allen testified that: (1) Ramos was in custody for at least 4 or 5 hours when the police started to question him, (2) the handcuffs were removed when Ramos was taken to the interrogation room, (3) Ramos was "wide awake" and did not appear to be under the influence of alcohol or drugs, and (4) Ramos was in a "good state of mind," "polite," and "[not] in a state of shock."

According to Golubski, Ramos was tired. He said Ramos told them he had been up all night. Golubski did not recall whether Ramos was injured when the officers arrested him.

Both detectives said that Ramos was read his *Miranda* rights before they initially talked to him. Ramos talked to the detectives for about 20 minutes. Then, the detectives turned on the recorder and read Ramos his *Miranda* rights again, intending to tape his statement. After hearing his *Miranda* rights the second time, Ra-

mos said he wanted an attorney. Allen turned off the recorder and told Ramos they were finished talking.

The detectives testified that when Golubski stopped to either make a phone call or to leave the room, Ramos asked them what his friends did. Detective Golubski told Ramos that the others gave statements. Then, Ramos said, "Fuck it. I want to give a statement then." Allen reminded him that he had invoked his right to an attorney, but Ramos said he still wanted to give a statement. Then, Allen told Ramos, "[Y]ou know you can have a lawyer here." Ramos said he understood his rights. When asked if he was sure he wanted to give a statement, Ramos said, "Yes."

Santana Spurlock saw Ramos in the juvenile detention center. According to Spurlock, Ramos was limping, had scratches on his face, and had knots on his head. Spurlock agreed that Ramos' bruises were "pretty apparent" by looking at his face.

Ramos testified that the injuries that Spurlock saw occurred during his arrest. He said the arresting officers threw him to the ground, and one of them stepped, stood, or knelt on his back, while the other officer grabbed his head and hit his face on the ground. Ramos said the officers struck him on the back, arms, and head with something. He testified that he was real tired when he gave his statement to the detectives because he had not slept all night and was feeling the effects of being "drunk and high." He said he tried to sleep while he waited to be questioned.

Ramos emphasizes the fact that his parents were not present when he spoke to the police. The detectives did not ask him if he wanted his mother or father to be present. He notes that we have adopted a bright line rule requiring parent involvement when interrogating a juvenile under 14 years of age. *In re B.M.B.*, 264 Kan. 417, Syl. ¶ 2, 955 P.2d 1302 (1998).

Ramos was *not* under 14 years of age. The *B.M.B.* rule is not applicable. The district judge made the following findings regarding the motion to suppress:

"[T]hey told him that his friends had given statements, and at that point, he decided he'd go ahead and give a statement. The question here is . . . I agree with you—is . . . who initiated this . . . change; and your client indicates not that he didn't ask if . . . everybody else or anybody else had given statements,

he doesn't remember whether he asked it or not. And both detectives say that he asked it. Now, obviously they—once they terminate an interview, they don't leave a recorder on just on the possibility that maybe somebody is going to change their mind. Clearly it doesn't happen very often once that right has been invoked. I think it's obvious from the photograph that the defendant has some scratches on his face. It looks like primarily on the right side. But he was there for some period of time, as far as I can tell; or at least from his testimony today, he didn't seek medical treatment. He didn't indicate that they . . . had any effect on his . . . state of mind at the time that he was giving the statement. In fact, essentially, he said the same thing about the alcohol and drugs. Now, he says the fatigue did, and that he was tired, and that they sometimes had to repeat . . . questions. But he never does say that anyone threatened him—in fact, specifically says just the opposite—and as far as I can tell, doesn't say that anything that he said was . . . not true as a result of this influence of the fatigue. Based upon the testimony I've heard, I don't believe—simply based upon the defendant's age, simply based upon what are apparently superficial injuries sustained some seven hours later [*sic*], I can't find that this statement was not voluntary; and I can't find, based upon what I've heard, that the . . . detectives are the ones who instigated his change of heart as to . . . whether or not he was going to give a statement and invoke his right to counsel. I don't believe that there's a basis for me to suppress the statement, and . . . so your motion is denied."

Ramos argues that the court had no information concerning his maturity. However, the evidence showed that Ramos was 16 years old, had completed 9th grade, and lived independent of any adult.

No evidence was presented regarding whether Ramos had previous experience in dealing with police officers. Ramos points out that he was at the police station for a considerable length of time before detectives questioned him. Allen testified that the initial delay was because several other people were interviewed before Ramos.

Ramos was not given any food during his wait at the police station. Allen testified that Ramos was in a good state of mind and polite. Ramos did not appear to be under the influence of alcohol or drugs. Although Ramos seemed to be tired, he did not have slurred speech, his statements were coherent, and he was not repetitive. He was fully aware of why he was at the police station, and he testified that he understood his *Miranda* rights. The detectives did not ever use a threatening tone of voice or get physical with him during the questioning. No threats or promises were made to Ramos.

We have stated that where "the accused is a juvenile, this court exercises the greatest care in assessing the validity of the confession." *Davis*, 268 Kan. at 675. Applying our standard of review, under the totality of the circumstances, Ramos' statement was voluntary and properly admitted by the district court.

## Right to Counsel

Next, Ramos contends that the district court erred in admitting his taped statement because he made the statement after he invoked his Fifth Amendment right to counsel. This contention lacks merit.

It is well established that during an interrogation, if a suspect says that he or she wishes to speak to an attorney, interrogation must cease. Officials may not reinitiate interrogation without counsel present, whether or not the suspect has consulted with an attorney. *State v. Caenen*, 270 Kan. 776, Syl. ¶4, 19 P.3d 142 (2001); *State v. Davis*, 268 Kan. 661, 676, 998 P.2d 1127 (2000). Ramos was reminded that he had invoked his rights and that he could have an attorney, but he said he wanted to give a statement. On the tape, before giving his statement, he agreed that he was the one who reinitiated the questioning.

According to Ramos, after he asked for an attorney, the detectives turned off the recorder. He said he could not remember the order of events leading to his saying that he wanted to make a statement. He said they told him that they did not care whether he made a statement, they just wanted to hear his side of the story. He said they told him that everyone else had made a statement and that it was in his best interest to make one. Ramos agreed that he wanted to give a statement because the other guys had already given one.

At the suppression hearing, Ramos denied initiating the conversation with the detectives. However, regarding a transcription of the taped statement, the prosecutor asked:

"Well, . . . it says, 'Okay. Did myself or Detective Golubski try to persuade you in order to give this statement?' And you said 'No.' 'And are you the one that reinitiated and said I'll go ahead and give a statement?' 'Yes.' 'Did myself or Detective Golubski ever threaten you in any way for you to give us this statement?'

'No.' 'And are you willing to give a statement?' 'Yes.' You don't remember those questions and . . . answers?"

Ramos answered, "No, but, I—I mean, that sounds—that sounds right. I mean, I did tell them I'd give them a statement."

In *State v. Kanive*, 221 Kan. 34, 37, 558 P.2d 1075 (1976), we said: "The prohibition against continued interrogation in the face of a refusal to talk does not invalidate a statement thereafter given where the right to remain silent has been voluntarily and knowingly waived at a later time." The evidence shows that after the tape recorder was turned off, one of the detectives told Ramos that they did not care whether he gave a statement and that "[i]t's just to hear your side of the story." Ramos could not remember asking what the others had done, but both detectives testified that he asked what the others had done. Then, Ramos told the detectives that he wanted to give a statement. They were careful to ask him if he understood that he had the right to an attorney. However, he told the detectives that he wanted to go ahead and give a statement.

Ramos reinitiated the discussion with the detectives. The district court did not err in denying Ramos' motion to suppress.

## The Consecutive Sentences

Next, Ramos argues that the district court erred by imposing consecutive sentences for both first-degree felony murder and criminal discharge of a firearm at an occupied dwelling. He contends that both convictions were based on the same act. He argues that the crimes merged and, thus, imposing consecutive sentences violated the constitutional prohibition against double jeopardy. His argument is not persuasive.

Ramos was convicted of criminal discharge of a firearm at an occupied dwelling that resulted in great bodily harm. K.S.A. 2000 Supp. 21-4219(b). Here, the great bodily harm was the death of Elizabeth Manning. He was also convicted of felony murder, where the underlying felony was the criminal discharge of a weapon at an occupied building resulting in great bodily harm. The district court imposed a life sentence on Ramos for the felony murder conviction and imposed a consecutive sentence of 64 months on the conviction for criminal discharge of a firearm.

*State v. Rayton*, 268 Kan. 711, 1 P.3d 854 (2000), controls. In *Rayton*, we examined whether the charge of criminal discharge of a firearm merges into the charge of felony murder. We noted that criminal discharge of a firearm at an occupied dwelling requires proof that a defendant discharged a firearm at an occupied dwelling. We also noted that felony murder requires proof that a person was killed during the commission of an inherently dangerous felony. Thus, we concluded that the two crimes are separate and distinct offenses which require proof of different elements. We found that the two crimes do not merge and that the punishment for both crimes does not violate double jeopardy. 268 Kan. at 725.

Ramos argues that *Rayton* is in direct conflict with *State v. Smallwood*, 264 Kan. 69, 955 P.2d 1209 (1998). In *Smallwood*, the defendant appealed his convictions for felony murder, K.S.A. 21-3401, and for two counts of child abuse, K.S.A. 21-3609. 264 Kan. at 70. Smallwood argued that the imposition of consecutive sentences for his convictions for first-degree felony murder and child abuse violated the constitutional prohibition against double jeopardy.

We noted in *Smallwood* that distinguishing felony murder from child abuse that results in death has had a tumultuous history in Kansas. We found that a single assaultive incident of child abuse, K.S.A. 21-3609, that results in the death of the child merges with killing and constitutes only one offense. 264 Kan. at 91-92. We concluded that Smallwood's act of shaking the child was the act that caused great bodily harm and the death of the child and was the basis for both crimes. The abuse of the child was not separated in time or distinct from the death of the child. Thus, the child abuse offense merged with the offense of felony murder. We concluded that convictions for both crimes violated double jeopardy. 264 Kan. at 94. Ramos contends that had the strict elements analysis been used in *Smallwood*, we would not have vacated the child abuse conviction. Ramos observes that the offense of abuse of a child requires proof that the defendant intentionally tortured, cruelly beat, or shook a child under the age of 18. K.S.A. 21-3609. Thus, Ramos concludes that under the reasoning in *Rayton*, since each offense requires proof of different elements, a conviction of

both offenses, child abuse and felony murder, would not constitute a double jeopardy violation.

*Smallwood* is not inconsistent with *Rayton*. In *Smallwood*, we considered the elements test, but we decided: "The abuse of the child is not separated in time or distinct from the death of the child. Because there was only one act, the elements of the abuse of a child are not distinct from the homicide." 264 Kan. at 94. We concluded that under K.S.A. 21-3436(a), the legislature intended that anyone who causes the death of a child while committing the act of child abuse is guilty of first-degree felony murder. 264 Kan. at 94.

Here, like the situation in *Rayton*, the two crimes were separate and distinct. Unlike a situation where a child's death is caused by an act of child abuse, the act of discharging a firearm into an occupied dwelling was distinct from the death of Mrs. Manning. Ramos shot multiple times, not just once, into the Manning house. Consecutive sentences for felony murder and criminal discharge of a firearm did not violate double jeopardy.

### The Prosecutor's Closing Remarks

Finally, Ramos contends that the prosecutor committed misconduct during closing arguments. He argues that this alleged misconduct warrants a reversal of his convictions. We disagree.

The complained-of prosecutorial statements were objected to at trial. Our analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process: (1) We must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence, and (2) we must determine whether the remarks were so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial. *State v. Miller*, 268 Kan. 517, 520, 997 P.2d 90 (2000).

Here, the prosecutor noted that Garcia and Valdez confessed after their arrests and then testified consistently with their confessions. She contrasted their situations with that of Scheina's. The prosecutor said the following:

"Contrast that with Paul Scheina who denied his involvement to the police the night of. Well, actually he wasn't spoken to the night of because the only three that were taken into custody was Jaime [Valdez], Roy [Garcia], and Mr. Ramos. But later when Paul was arrested, he lied to the police, at least so he says, and he told the police that he wasn't involved in the—any of the drive-by shootings. And now he's been caught, he's been charged, he's been convicted, he's been sentenced harsher than what the plea agreement was, and he's mad. So, he'll do anything he can to spite the State."

Defense counsel objected, saying, "I don't believe there is any evidence regarding length of sentence before this tribunal, Your Honor." The prosecutor said she had asked Scheina about whether the sentencing court followed the plea agreement. Then, the district court overruled the objection and instructed the jury: "[I]t's up to you to determine what the facts in this case are, and the reasonable inferences you can draw from any of the facts of the case."

Ramos argues that the prosecutor's remarks gave the impression that Scheina was sentenced for a longer duration than what he expected. He concludes that there is a strong argument for bias not supported by the record. The following testimony was elicited at trial:

"Q: [From the Prosecutor] Well, let me know this, Mr. Scheina, how do we know when you're telling the truth and when you're not telling the truth?
"A: I don't know.
"Q: All we know is your word, what you tell us, don't we?
"A: Yeah.
"Q: And in fact, part of the—the plea agreement in this case, . . . involved some things that the sentencing judge didn't go along with, didn't it?
"A: Yeah.
"Q: And you're kind of mad about that, aren't you?
"A: Not really. I figure I got what I deserved.
"Q: What did you deserve?
"A: Time. I should get punished for what I did."

Scheina's testimony suggested that the sentencing court did not follow the plea agreement and that he was given a more severe sentence than what was recommended in the agreement. The prosecutor's comments were within the realm of fair comment on the evidence and were not improper. Moreover, the court instructed the jury to draw its own inferences from the evidence. There is no

basis in the record to establish that the jury here did not follow the district court's instructions. See *State v. McCorkendale*, 267 Kan. 263, 284, 979 P.2d 1239 (1999).

Affirmed.