2001 SD 19

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Dawn Marie FRAZIER, Defendant and Appellant.**

**No. 21375.**

Supreme Court of South Dakota.

Argued Oct. 25, 2000.

Decided Feb. 21, 2001.

---

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, South Dakota, for plaintiff and appellee.

Bruce A. Hubbard, Hansen, Hubbard & Swanson, Sturgis, South Dakota, for defendant and appellant.

GILBERTSON, J.

[¶ 1.] Dawn Frazier (Frazier) was convicted by a jury for the kidnapping and felony murder of Morning Star Standing Bear and sentenced to life imprisonment. She appeals her conviction and sentence. We affirm in part and reverse in part.

## FACTS AND PROCEDURE

[¶ 2.] On June 15, 1999, Frazier, Chaske White, Robert Horse, and Jerry Horse were partying at another friend's home in Rapid City. During the course of the evening, they left the house and went to a bar. While at the bar, Jerry Horse picked up a young woman with whom he was acquainted, Morning Star Standing Bear. When the bar closed, Standing Bear accompanied the group back to the friend's home for additional partying. Standing Bear was visibly intoxicated at this point and passed out for a short time at the friend's home. Eventually, Frazier, White, Robert Horse, Jerry Horse and Standing Bear left the house in Frazier's vehicle.

[¶ 3.] After dropping Jerry Horse off at his home, the remaining four continued to drive around the area of north Rapid City. By this time, Standing Bear was nearly unconscious.[1] Ultimately, the group stopped on a gravel road outside Rapid City. At this point, Standing Bear was removed from the car by White and Robert Horse where she was kicked, beaten and stabbed numerous times. Her injuries were caused, in part, by a car jack and a broken beer bottle. As a result of these injuries, Standing Bear died. Her naked

---

1. Standing Bear's blood alcohol content at the time of her death was 0.342%.

body was dragged into a ditch where it was discovered the next morning.

[¶ 4.] The next day, law enforcement interviewed Jerry Horse regarding his involvement with Standing Bear. Through this interview, law enforcement was lead to Frazier. In the evening hours of June 17, 1999, Department of Criminal Investigation (DCI) agent Jones located Frazier at the home of White's mother. He requested that Frazier accompany him to the DCI office. Frazier agreed and drove her own car there.

[¶ 5.] Upon her arrival, she was taken to a conference room where she was interviewed by Jones, beginning at 7:55 p.m. At the commencement of the interview, Jones read Frazier her Miranda rights. Frazier waived those rights; the interview lasted approximately 50 minutes. The first interview, the Miranda warning and Frazier's waiver were not recorded.[2] A second interview began at 9:30 p.m. No Miranda warnings were given at the commencement of this second interview, which lasted until 11:10 p.m. Jones questioned Frazier a third time, beginning at 1:45 a.m. At this time, Jones reminded Frazier of her Miranda rights, which had previously been read to her. Frazier stated that she understood her rights and would continue speaking with Jones. The third interview lasted 28 minutes. At 2:20 a.m., Jones again questioned Frazier, this time for approximately 15 minutes.

[¶ 6.] A final interview between Frazier and Jones commenced at 2:40 a.m. Prior to the final interview, Frazier told Jones that she was afraid of White and possible retaliation by him against her. To ease her fears and support Jones' assertion that White would be incarcerated for his participation, Jones arranged for White to be escorted in handcuffs past the open door of the room where Frazier was being questioned.

[¶ 7.] Thereafter, Frazier gave a detailed description of what had happened during the early morning hours of June 17, 1999. She claimed that White directed her as to where she should drive. Frazier claimed that she repeatedly requested to go home because she was tired, but White refused. She believed that Robert Horse and possibly White were going to have sex with Standing Bear. White instructed Frazier to stop the car on the gravel road where Standing Bear was killed. Frazier claimed that White ordered her to stay in the car and not watch what White and Robert Horse were doing. She stated that while looking in the rear view mirror, she witnessed White and Robert Horse beating Standing Bear. Frazier got out of the car on a number of occasions, once to open the trunk of her car, several times to urge White and Robert Horse to "hurry up," each time returning to the car upon threats from White. Each time she left the confines of the car, she witnessed further beating, but according to her statement, she did not actually participate. Finally, after Standing Bear's lifeless body was dragged across the road into a ditch, Frazier drove White and Robert Horse back into Rapid City.

[¶ 8.] Frazier was charged with the kidnapping and felony murder of Standing Bear. Prior to trial, Frazier made a motion to suppress the statements made to law enforcement, including her consent to the search of her residences.[3] This motion was based on the fact that Frazier was not read her Miranda rights by law enforcement at the commencement of each interview. It was also based on alleged deception by law enforcement, and Frazier's lack of food and sleep.

[¶ 9.] In its findings of fact, the circuit court found that Frazier had been read her Miranda warnings, that she understood her rights, and that she agreed to

---

2. Only the third and fifth interviews were tape-recorded.

3. Frazier had personal belongings at a friend's apartment and at her mother's house. She consented to the search of both residences.

waive those rights and answer Jones' questions. The circuit court also found that Frazier was cordial and polite and was not under the influence of alcohol or drugs, but she was "likely tired" after working during that day. According to the circuit court's findings of fact, Frazier was reminded of her Miranda rights at the beginning of the third interview. Frazier indicated a willingness to continue talking with Jones. Based on these facts, the court found that Frazier knowingly, freely and voluntarily waived her right to remain silent and her right to have an attorney present. The court also found that Frazier's statements to law enforcement personnel and consent to search were, beyond a reasonable doubt, given freely and voluntarily.

[¶ 10.] Frazier also challenged the admission of two taped interviews between Jerry Horse and law enforcement personnel. Because Jerry Horse was unavailable to testify at trial,[4] the State sought to admit the interviews under SDCL 19–16–35, the residual exception to the hearsay rule. Frazier claimed these statements did not exhibit "circumstantial guarantees of trustworthiness" as required under the evidentiary rule. Frazier argued that the two statements often contradicted each other, the statements were not made under oath, and the statements pertained to a period during which Jerry Horse was highly intoxicated. In addition, Frazier claimed that the admission of the statements violated her rights under the Confrontation Clause of the United States Constitution. The circuit court found that Jerry Horse's statements were the best evidence of how Standing Bear came to be in Frazier's car. In addition, the court found that the statements were not particularly incriminating as to Frazier, merely reiterating much of her own statement.

For those reasons, the court allowed the State to introduce those statements.

[¶ 11.] On January 14, 2000, the jury convicted Frazier on both counts. The circuit court sentenced her to life imprisonment on both counts with sentences to run concurrently.[5] She now appeals, raising the following issues:

1. Whether the circuit court erred in denying Frazier's motions to suppress her statements and the subsequent searches of her car and residences.

2. Whether the circuit court erred by admitting out of court statements of Jerry Horse into evidence.

3. Whether the circuit court erred in giving a jury instruction on flight or concealment.

4. Whether the trial court erred in denying Frazier's motion for judgment of acquittal.

5. Whether South Dakota's felony murder statute is unconstitutional as cruel and unusual punishment.

## ANALYSIS AND DECISION

[¶ 12.] **1. Whether the circuit court erred in denying Frazier's motions to suppress her statements and the subsequent searches of her car and residences.**

[¶ 13.] We review a trial court's decision on a motion to suppress under a de novo standard. *State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488. "Although the underlying circumstances surrounding an interrogation are factual determinations, ultimately voluntariness is a legal question, requiring independent judicial review." *Id.* (citing *Miller v. Fenton*,

4. At the time of trial, Jerry Horse was a fugitive; an arrest warrant had been issued for him in connection with a robbery in Norfolk, Nebraska.

5. White pled guilty to first-degree murder and kidnapping. In exchange, the State agreed

not to seek the death penalty. He was sentenced to life imprisonment on each charge with the sentences to run consecutively. Robert Horse was convicted of first-degree murder and kidnapping by a jury and sentenced to life imprisonment on each conviction.

474 U.S. 104, 116, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405, 414–15 (1985)).

[¶ 14.] This issue can be further divided into two sub-issues: (a) whether the Miranda rights given to Frazier had become stale by the time of her confession; and (b) whether Frazier's waiver of those rights was given in a free and voluntary manner.

[¶ 15.] **A. Whether the Miranda rights read to Frazier had become stale by the time of her confession.**

[¶ 16.] Miranda warnings are required whenever a suspect is in police custody. *State v. Gesinger*, 1997 SD 6, ¶ 17, 559 N.W.2d 549, 552. The circuit court concluded that from the time of her arrival at the DCI office, Frazier could reasonably have believed that she was not free to leave. There is no dispute that Frazier was read her Miranda warnings upon arrival at the DCI office, and reminded of those rights before commencement of the third interview at approximately 1:45 a.m. Frazier argues that by the early hours of the morning of June 18th, the prior warnings had grown "stale," which would require law enforcement to repeat the warnings. We do not agree.

[¶ 17.] Initially, "once the mandate of *Miranda* is complied with at the threshold of the interrogation by law enforcement officers, the warnings need not be repeated at the beginning of each successive interview." *State v. Davis*, 268 Kan. 661, 998 P.2d 1127, 1138–39 (2000). A set of warnings must be repeated " 'only in those situations where a substantial probability exists that warnings given at a previous interrogation are so stale and remote that a substantial possibility exists that the suspect was unaware of his or her constitutional rights at the time subsequent interrogation occurs.' " *People v. Baltimore*, 292 Ill.App.3d 159, 226 Ill.Dec. 372, 685 N.E.2d 627, 630 (1997). To determine whether a previous Miranda warning has grown stale or remote, courts must look to the totality of the circumstances surrounding the warning. *Commonwealth*

*v. Scott*, 561 Pa. 617, 752 A.2d 871, 875 (2000). Relevant factors include:

the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether the statements obtained are materially different from other statements that may have been made at the time of the warnings.

*Id.* In sum, Miranda warnings will not be considered stale when there has been a " 'clear continuity of interrogation.' " *Id.*

[¶ 18.] Applying these factors to the case at hand, we find there was a "clear continuity of interrogation" such that Jones was not required to readvise Frazier of her Miranda rights. Frazier was under police supervision the entire time she was at the DCI office. Each time Frazier was interviewed, she was questioned by the same officer (Jones), at the same location (DCI office), and all but one interview was in the same room at the DCI office. The subject matter of each interview was the same, i.e., the death of Standing Bear. Frazier relies heavily upon the span of time between the initial warning and her final statement. While Frazier was read her Miranda rights roughly six and a half hours before her final statement, she was reminded of those rights a mere hour before her final interview. Even without the reminder, the six and a half hour time span would not cause the initial warning to become stale. *See Davis*, 998 P.2d at 1138 (holding that a six and a half hour break between the initial warning and defendant's confession did not cause the initial warning to become stale); *State v. Trostle*, 191 Ariz. 4, 951 P.2d 869, 879 (1997) (warning not stale after seven hours); *Osborne v. State*, 263 Ga. 214, 430 S.E.2d 576, 578 (1993) (warning not stale when defendant was questioned the next day); *State v. Rowe*, 479 A.2d 1296, 1299 (Me.1984) (warning not stale after more than nine hours). After examining the totality of the circum-

stances, there was a clear continuity of interrogation and it is apparent that Frazier was aware of her constitutional rights at all times during the interview process. The mere passage of time, on its own, such as occurred here, will not convince us otherwise.

[¶ 19.] **B. Whether Frazier's waiver of her rights was given in a free and voluntary manner.**

 [¶ 20.] Frazier challenges the waiver of her Miranda rights as well as the consent to search her residences. The same voluntariness test applies to both challenges. Incriminating statements or confessions are not voluntary if, in light of the totality of the circumstances, the will of the defendant has been overborne by law enforcement. *State v. Smith*, 1999 SD 83, ¶ 36, 599 N.W.2d 344, 352. When considering the totality of the circumstances, we examine the following factors:

(1) the defendant's age; (2) the defendant's lack of education or low intelligence; (3) the absence of any advice to the defendant of [her] constitutional rights; (4) the length of detention; (5) the repeated and prolonged nature of the questioning; and (6) the use of physical punishment such as deprivation of food or sleep. A defendant's prior experience with law enforcement officers and the courts is also a factor this Court considers.

*Id.* "Deception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider, however, the police may use some psychological tactics in interrogating a suspect." *State v. Darby*, 1996 SD 127, ¶ 31, 556 N.W.2d 311, 320. "The question is not whether the interrogators' statements [or actions] were the cause of the confession but whether those statements [or actions] were so manipulative or coercive that they deprived [Frazier] of [her] ability to make an unrestrained, autonomous decision to

confess." *Smith*, 1999 SD 83, ·¶ 36, 599 N.W.2d at 352. The circuit court found that Frazier waived her right to remain silent and consented to the search of her residences. The court further determined that the waiver and consent were "voluntary beyond a reasonable doubt." We review these determinations de novo. *Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d at 488.

[¶ 21.] Initially, it should be noted that at the time of her arrest, Frazier was 31 years old. There is no record of Frazier's educational background or intelligence, nor is it alleged that she was deficient in either category. Although she has had little involvement with the criminal justice system, she was informed of her constitutional rights before any questioning began.

[¶ 22.] Frazier relies upon the following evidence to support the claim that her statements were not made voluntarily; the repeated and prolonged questioning; the fact that she had only two and a half hours of sleep the previous night; the fact that she yawned repeatedly during the interviews; the fact that the consent to search form was signed at 4:40 a.m.; and finally, the deception and misrepresentations by law enforcement.

[¶ 23.] Frazier was questioned for a total of five and a half hours. During the interviews, Frazier yawned on a number of occasions and stated several times that she was tired. Yet, at no time did she request that questioning cease. There were several breaks, during which time she was allowed to smoke, drink coffee, lie down, watch television, and use the restroom.[6] Frazier was alert and responsive during questioning; she was cordial and polite to Jones. While the consent to search form was signed in the early hours of the morning, the issue of searching her residences had been brought up earlier. Although she may have been tired from the questioning, "there is no evidence that [she]

---

6. At one point in the interview process Frazier claimed to be sleepy. The officer offered to take a break to let her take a nap. Instead, she opted for a cup of coffee, cigarettes and to continue the interview.

was so overcome by fatigue or stress as to prevent a voluntary waiver." *State v. Ferola*, 518 A.2d 1339, 1346 (R.I.1986); *see State v. Ervin*, 979 S.W.2d 149, 161 (Mo. 1998) (finding no evidence that defendant's lack of sleep "affected his ability to understand and voluntarily waive his rights" even when he had not slept for twenty-four hours). It is a fact of life for law enforcement that suspected criminals do not often readily volunteer incriminating evidence. It takes time to elicit the facts, explore inconsistencies and arrive at the truth.

[¶ 24.] The deception that Frazier claims coerced her statements include statements by Jones that her stay at the DCI office would be brief, the questioning was a two-way street, that Jones would not discard Frazier like an old rug, and if she answered his questions and consented to the search, she would be allowed to return home. In addition, Jones arranged for White to be led past the open door of Frazier's interrogation room in handcuffs. Police interview tactics are an important part of the interrogation process and may be used to obtain a confession so long as the confession is " 'a product of the suspect's own balancing of competing considerations.'" *Darby*, 1996 SD 127, ¶ 31, 556 N.W.2d at 320 (quoting *State v. Dickey*, 459 N.W.2d 445, 447 (S.D.1990)). We cannot say that these statements and misrepresentations were overly coercive or manipulative. Jones' statements were merely

psychological tactics, which did not interfere with Frazier's "unconstrained, autonomous decision to confess." [7] *Id.* While lack of sleep and deception may have existed, after reviewing the totality of the circumstances, we cannot say that the circuit court erred in holding that Frazier's waiver of her Miranda rights and consent to search was free and voluntary.[8]

[¶ 25.] **2. Whether the circuit court erred by admitting out of court statements of Jerry Horse into evidence.**

[¶ 26.] Jerry Horse was interviewed on two separate occasions by law enforcement, first on June 17, 1999 and again on June 22. These statements were admitted at trial under SDCL 19–16–35,[9] the residual hearsay exception. Jerry Horse's unavailability was stipulated by the parties, as he was a fugitive at the time of trial. At a hearing on the issue, the State argued that the statements were reliable because they were corroborated by Frazier's confession. The circuit court admitted the statements because they were material as to how the victim came to be in Frazier's vehicle, and the statements were the best evidence available for trial on that issue. Frazier challenges the admission of those statements under SDCL 19–16–35 and the Sixth Amendment to the United States Constitution.

A statement not specifically covered by any of §§ 19–16–30 to 19–16–34, inclusive, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by § 19–16–4 if the declarant is unavailable as a witness and if the court determines that

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

---

7. These tactics can be distinguished from those used in *Stanga*. In that case, the interrogating officer repeatedly promised the defendant that any statements made during the interrogation were between the two of them, and would not leave the interrogation room. *Stanga*, 2000 SD 129, ¶¶ 10–11, 617 N.W.2d at 489. We found that such statements effectively nullified the Miranda warning previously given to the defendant. *Id.* ¶¶ 18–19, 617 N.W.2d at 490–91.

8. While not dispositive, at the end of the final interview, Frazier stated she had not been threatened in any fashion to give the statement, that she was promised nothing to give it and that she offered it of her own free will.

9. The statute provides in relevant part:

[¶ 27.] Whether the statements are admissible under SDCL 19–16–35 need not be decided as we find that their admission violates the Federal Confrontation Clause. U.S. Const. amend. VI.

> The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.

*Lilly v. Virginia,* 527 U.S. 116, 123–24, 119 S.Ct. 1887, 1894, 144 L.Ed.2d 117, 126 (1999) (citing *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666, 678 (1990)). While the Confrontation Clause does not bar all hearsay statements against a criminal defendant, it does "bar[ ] the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638, 651 (1990). For purposes of constitutional analysis, the proponent of the evidence must either produce the declarant, or if the declarant is unavailable, it bears the burden of showing "indicia of reliability" before the statement may be admitted. The United States Supreme Court has stated that such "indicia of reliability" is inferred when "the evidence falls within a firmly rooted hearsay exception." *Id.* at 815, 110 S.Ct. at 3146, 111 L.Ed.2d at 652. Where, as in the present case, the evidence does not fall within an established exception, it is inadmissible without a showing of "particularized guarantees of trustworthiness." *Id.* at 816, 110 S.Ct. at 3147, 111 L.Ed.2d at 653. *See also Lilly,* 527 U.S. at 125, 119 S.Ct. at 1894, 144 L.Ed.2d at 127. These "particularized guarantees of trustworthiness" can be shown from the totality of the circumstances, but only those circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright,* at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 655. Of specific importance to this case, evidence that corroborates the statement *cannot* be used to support a finding of trustworthiness. *Id.* at 822, 110 S.Ct. at 3150, 111 L.Ed.2d at 656–57. The statement must be trustworthy *on its own. Lilly,* 527 U.S. at 138, 119 S.Ct. at 1901, 144 L.Ed.2d at 135.

[¶ 28.] As previously noted, the statements of Jerry Horse were admitted into evidence under SDCL 19–15–35, the residual hearsay exception. State residual hearsay exceptions are not considered a "firmly rooted hearsay exception for Confrontation Clause purposes." *Wright,* 497 U.S. at 817, 110 S.Ct. at 3147, 111 L.Ed.2d at 653. As such, the prosecution does not receive the inference of reliability that would apply under a firmly rooted hearsay exception. Applying the law as expressed by the United States Supreme Court, we begin with the presumption that hearsay statements are inadmissible against criminal defendants. The prosecution, as proponent of the statement, bears the responsibility of overcoming this presumption with independent indicia of reliability. During a hearing on this issue, the prosecution did not offer one such indication. No mention was made as to why Horse's statements were inherently reliable, so as to make cross-examination unnecessary or superfluous.[10] Instead, the prosecution relied entirely upon the fact that much of the statements were corroborated by the defendant's own statement. Whether the statement is corroborated by other evidence is irrelevant to the admissibility of the statement. *Id.* at 822, 110 S.Ct. at 3150, 111 L.Ed.2d at 656–57. Whether the statement is the best or only available evidence on a particular topic is also irrelevant. Whether the statement is particularly incriminating as to the defendant is, likewise, irrelevant. None of these considerations become an issue until *after* the

---

**10.** As previously noted, Horse's statements pertained to a period of time during which he was highly intoxicated.

proponent has proven the statement to be trustworthy and reliable.

[¶ 29.] The State now seeks to demonstrate the reliability of Jerry Horse's statements by noting that the statements were recorded, the officers used open-ended questions, the statements are "plausible," and because Jerry Horse had no reason to lie. While certain procedural protections were in place during the interview, they will not overcome this constitutional violation. Using the existence (or absence) of procedural protections as part of the constitutional analysis was explicitly rejected by the United States Supreme Court in *Wright*. The *Wright* Court stated that "we do not believe the Constitution imposes a fixed set of procedural prerequisites to the admission of such statements at trial." *Id.* at 818, 110 S.Ct. at 3148, 111 L.Ed.2d at 654. Instead, the State must show from the totality of the circumstances that the statements are trustworthy. The State has failed to carry this burden. To justify the admission of these statements on the grounds urged by the State would clearly violate the United States Supreme Court's mandate in *Wright*. We refuse to find that every statement given to police will be admissible against a criminal defendant merely because the statement is recorded, "plausible," and the proponent later claims that the declarant had no reason to lie. None of these reasons espoused by the State would render cross-examination of Jerry Horse unnecessary or of "marginal utility." *Id.* at 823, 110 S.Ct. at 3150, 111 L.Ed.2d at 657. Because the prosecution did not offer even a scintilla of evidence as to the independent reliability of Jerry Horse's statements, it was error for them to be admitted.[11]

[¶ 30.] The question for us thus becomes whether the admission was harmless error. It is during *this* phase of the analysis where a court is allowed to consid-er corroborating evidence. As the United States Supreme Court stated, "the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless." *Id.* at 3150–51. In applying harmless error analysis we must decide beyond a reasonable doubt whether the erroneously admitted statements were harmless. *See Stanga*, 2000 SD 129, ¶ 20, 617 N.W.2d at 491. The harmless error doctrine preserves the essential purpose of criminal trials: to decide a defendant's guilt or innocence. The rule "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684–85 (1986).

[¶ 31.] With Confrontation Clause infractions, "[a]n assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation, such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Coy v. Iowa*, 487 U.S. 1012, 1021–22, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857, 867 (1988). In *Stanga*, after examining all the evidence, we encountered little doubt. He was caught in the midst of his crime. Here, there are doubts.

[¶ 32.] This is a case where the defendant was convicted as a principal to murder and kidnapping. She did not commit the crimes herself, but she drove the perpetrators and their victim to the site where the victim was beaten to death. Then she drove the perpetrators away. Critical to the jury's decision on her guilt was the question when she knew of their intent. Was she simply used by these

---

11. It would be prudent for the circuit courts of this state to carefully consider the constitutional implications addressed in this opinion any time SDCL 19–15–35 is invoked against a criminal defendant.

persons to accomplish their own ends or was she a willing participant in aiding them knowing their criminal purpose? Her primary defense at trial was that she may have suspected some criminal purpose but was unaware of the perpetrators' specific intentions. She also claimed she was afraid of one of the perpetrators, White, and dared not cross him. The out-of-court statements from Jerry Horse were used to refute her.

[¶ 33.] In closing arguments, the State referred several times to Jerry Horse's out-of-court statements to prove the defendant lied to the police. The statements were also used to rebut her defense that she feared White, by showing her cool response when Jerry Horse asked her if the murder really happened. For something that, according to the State on appeal, had little probative value, Jerry Horse's statements were certainly put to good use. The evidence is not so overwhelming that these statements cannot be said to have weighed against her in ultimately tipping the scales toward a guilty verdict. Therefore, we cannot say that these wrongfully admitted statements were not prejudicial beyond a reasonable doubt. We reverse.

[¶ 34.] 3. **Whether the circuit court erred in giving a jury instruction on flight or concealment.**

[¶ 35.] Under our standard of review, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law. An appellant must show not only that a particular instruction was erroneous, but also that it was prejudicial, meaning " 'the jury might and probably would have returned a different verdict if [the] instruction had been given.' " *State v. Walton*, 1999 SD 80, ¶ 12, 600 N.W.2d 524, 528 (quoting *State v. Rhines*, 1996 SD 55, ¶ 111, 548 N.W.2d 415, 443) (alteration in original) (additional citations omitted).

[¶ 36.] Frazier challenges the following instruction:

Flight or concealment by the defendant, after the events charged in the indictment occurred, does not create a presumption of guilt. You may consider evidence of flight or concealment, however, as tending to prove the defendant's consciousness of guilt. You are not required to do so. You should consider and weigh evidence of flight or concealment by the defendant in connection with all the other evidence in the case and give it such weight as in your judgment it is fairly entitled to receive.

This instruction is set forth in the South Dakota Pattern Jury Instructions (criminal) at 1–14–9.

[¶ 37.] In the past, instructions on flight or concealment have been viewed with disfavor because they appear to comment on the evidence. *See State v. Menard*, 424 N.W.2d 382, 384 (S.D.1988). For this reason, such instructions are to "be used sparingly and only when the special circumstances and evidence require." *Id.* However, an instruction on flight or concealment is allowed when the evidence supports four inferences:

(1) the defendant's conduct constituted flight [or concealment]; (2) the defendant's flight [or concealment] was the result of consciousness of guilt; (3) the defendant's guilt related to the crime with which [she] was charged; and, (4) the defendant felt guilty about the crime charged because [she], in fact, committed the crime.

*United States v. Martinez*, 190 F.3d 673, 678 (5th Cir.1999).

[¶ 38.] Frazier argues that her conduct did not constitute flight. We agree. While the homicide was being committed, her thoughts were not for the rescue of the dying Standing Bear; rather, she expressed fear of discovery as she exited the car, against the instructions of the perpetrators, with a demand for them to "just hurry up ... I want to go." However, after leaving the crime scene and body, her actions do not constitute flight. She returned the few miles to Rapid City,

the logical place for law enforcement to try to find her.

[¶ 39.] We do not believe that an instruction on flight is necessary or even permissible each time a criminal suspect leaves the scene of the crime. There must be some affirmative act by which the defendant seeks to avoid apprehension. *State v. Hutchinson,* 139 N.C.App. 132, 532 S.E.2d 569, 574 (2000); *State v. Wilson,* 185 Ariz. 254, 914 P.2d 1346, 1349 (Ariz.Ct.App.1996); *State v. Whittenmeir,* 725 S.W.2d 686, 688 (Tenn.Crim.App.1986). To endorse the use of a flight instruction every time a defendant leaves the scene of a crime would contradict the warning we issued in *Menard,* that the instruction should be used "sparingly." Indeed, the instruction would become part of nearly every criminal trial except where the accused was apprehended at the scene of the crime.

[¶ 40.] A much stronger case has been made for a claim of concealment of Frazier's involvement in the crime. To avoid damage to the car, she refused to allow the beating to continue on the trunk. When told by White and Robert Horse that they had killed Standing Bear, Frazier told them, "we need to go . . . if you guys don't come with me, I'm going right now." After the homicide, to avoid discovery, the perpetrators asked to put the body in the car trunk. Frazier responded, "no way." When she saw White's bloody hands, she informed him, "don't touch me." Once in the car, she told White, "don't touch nothing" with his bloody hands. At the home of White's mother, Frazier opened the trunk of her car to facilitate the disposal of Standing Bear's bloody clothes by White. When contacted by the police with a request to provide the shoes she wore the night of the murder, she intentionally turned in the wrong pair of shoes. Finally, during the first four interviews with law enforcement, she denied any knowledge of the crime. In closing argument to the jury, the State argued evidence of this type constituted evidence of concealment.

[¶ 41.] After reviewing the instructions as a whole, we find that they provided a correct statement of the law. The jury was instructed that every presumption favors the defendant's innocence, and that guilt must be proven beyond a reasonable doubt. These instructions are constitutionally and statutorily mandated in their application to the jury's resolution of the case. In contrast, the flight or concealment instruction is a rarity in that it informs and authorizes the jury to ignore its application if the jury so decides. In addition, the circuit court instructed the jury on the effect of White's alleged threat of force against Frazier. After listening to the evidence and all the instructions, the jury found Frazier guilty of kidnapping and felony murder. Frazier has failed to establish that were it not for the instruction on flight or concealment, the jury would have returned a different verdict. Therefore, it was not error to give this instruction.[12]

[¶ 42.] **4. Whether the trial court erred in denying Frazier's motion for judgment of acquittal.**

[¶ 43.] When the State rested its case, Frazier moved for a judgment of acquittal on the grounds that the State had failed to make a prima facie case of kidnapping and felony murder. Although we reverse on the Confrontation Clause issue, we believe it is proper to also examine Frazier's claim that the evidence was insufficient so as to justify the entry of a judgment of acquittal. Our basis for this decision rests on double jeopardy principles. Should we conclude that the evi-

12. Even though the instruction addresses flight or concealment, upon retrial it would be advisable to draft this instruction to conform to the evidence rather than give it as previously drafted even though it is a pattern instruction. If the evidence is limited to concealment rather than both flight and concealment, the instruction should be drafted to deal solely with the concealment allegation of the State.

dence was insufficient, the State is constitutionally prohibited from retrying her. *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1, 9 (1978). If, on the other hand, we find the evidence is sufficient, Frazier will be precluded from claiming double jeopardy protection at retrial. *State v. Mascarenas*, 129 N.M. 230, 4 P.3d 1221, 1230 (N.M. 2000). *See Dubria v. Smith*, 197 F.3d 390, 403 (9th Cir.1999) (reaching the merits of defendants insufficiency argument after reversing conviction on other grounds); *Mascarenas*, 4 P.3d at 1230 (noting that "[a]lthough not mandated by the double jeopardy clause, it is accordingly clearly the better practice for the appellate court on an initial appeal to dispose of any claim properly presented to it that the evidence at trial was legally insufficient to warrant the thus challenged conviction."); *State v. Brown*, 258 Neb. 330, 603 N.W.2d 419, 430 (1999) (stating that the court "must consider Brown's challenge to the sufficiency of the evidence in order to determine whether Brown may be retried.").

[¶ 44.] When reviewing a motion for judgment of acquittal, we must ultimately decide "whether [the] State set forth sufficient evidence from which the jury could reasonably find the defendant guilty of the crime charged." *State v. Holzer*, 2000 SD 75, ¶ 10, 611 N.W.2d 647, 650.

> In determining the sufficiency of the evidence on review, the question presented is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In this review, we must accept that evidence, and the most favorable inferences to be fairly drawn therefrom, which will support the verdict. In determining the sufficiency of the evidence, this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt.

*State v. Buchholz*, 1999 SD 110, ¶ 33, 598 N.W.2d 899, 905 (quoting *State v. Knecht*, 1997 SD 53, ¶ 22, 563 N.W.2d 413, 421).

[¶ 45.] When a trial court considers a motion for acquittal, it takes into account all the evidence it has admitted. Because a finding that the evidence is insufficient to sustain a guilty verdict is treated the same as a judgment of acquittal, a reviewing court must likewise consider all the evidence the trial court had before it, including any evidence that is later determined to be inadmissible. *Lockhart v. Nelson*, 488 U.S. 33, 41–42, 109 S.Ct. 285, 291, 102 L.Ed.2d 265, 274 (1988). There are two bases for this rule.

> From a defendant's viewpoint, if the evidence were determined to be sufficient, such a review would constitute an invasion of the province of the jury. Conversely, if the evidence were determined to be insufficient, it would be unfair to the [prosecution] because other evidence might have been produced by the [state's] attorney at trial if the questioned evidence had been excluded there.

*People v. Sisneros*, 44 Colo.App. 65, 606 P.2d 1317, 1319 (Colo.App.1980). Therefore, we review all the evidence admitted at trial, including the Jerry Horse statements that were wrongfully admitted.

[¶ 46.] Frazier was convicted of kidnapping in violation of SDCL 22–19–1. That statute provides in relevant part that:

> Any person who shall seize, confine, inveigle, decoy, abduct or carry away any person and hold or detain such person, ... (2) To facilitate the commission of any felony or flight thereafter; (3) To inflict bodily injury on or to terrorize the victim or another; ... is guilty of kidnapping.

In addition, Frazier was convicted of felony murder pursuant to SDCL 22–16–4, which reads, "[h]omicide is murder in the

first degree when ... committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, [or] kidnapping...." Frazier contends there was insufficient evidence to avoid the granting of a motion for acquittal for kidnapping and felony murder based upon that kidnapping. We disagree.

[¶ 47.] We cannot say that the evidence is so insufficient as to overturn the trial court's ruling. Frazier drove her car to the secluded area where Standing Bear was killed. She had every opportunity to stop driving or turn the car around. In her statement to law enforcement, Frazier claimed that she believed Robert Horse and White were going to rape Standing Bear. At no time during the beating did Frazier leave the scene, despite ample opportunity to do so. After Standing Bear's body was dragged into the ditch, she drove White and Robert Horse back to Rapid City. Frazier has failed to show that no reasonable jury could have returned a guilty verdict as to the kidnapping charge. She "simply recites whatever evidence is most favorable to [her] and derides unfavorable evidence and inferences therefrom...." *State v. Miller*, 429 N.W.2d 26, 38 (S.D.1988). The evidence and the inferences therefrom are adequate to support the trial court's denial of the motion for acquittal on the kidnapping charge.

[¶ 48.] There is no dispute that Standing Bear died as a result of the actions of Frazier, White and Robert Horse. Because we have found the evidence sufficient to affirm the trial court's ruling, as to the charge of kidnapping, the evidence is also sufficient to support the ruling on the felony murder charge. Therefore, double jeopardy does not prohibit the retrial of Frazier on these charges.

[¶ 49.] **5. Whether South Dakota's felony murder statute is unconstitutional as cruel and unusual punishment.**

[¶ 50.] As there will be a retrial, at this time it is unknown whether Frazier will be convicted of any crime, let alone felony murder or kidnapping. As such we do not reach this issue.

### Conclusion

[¶ 51.] We affirm in part and reverse and remand in part for retrial.

[¶ 52.] MILLER, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 53.] SABERS and AMUNDSON, Justices, concur in part and dissent in part.

SABERS, Justice, concurring in part and dissenting in part.

[¶ 54.] Dawn Frazier was thirty-one years old at the time of her arrest. She has no prior convictions. As a result of the jury's verdict she was sentenced to two counts of life imprisonment without parole. This jury verdict was supported by the improper out of court statements and an improper instruction on flight. The majority opinion recognizes error in both respects: 1.) the circuit court erred by admitting into evidence the out of court statements of Jerry Horse; and 2.) the circuit court erred in giving the jury instruction on flight. Additionally, the majority opinion unnecessarily addresses the sufficiency of the evidence to support these reversed convictions. I address each error in turn and then their cumulative impact.

[¶ 55.] **1. SUFFICIENCY OF THE EVIDENCE.**

[¶ 56.] The majority opinion conducts a review of the sufficiency of the evidence. It is well settled that the double jeopardy clause "does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to his conviction." *Parker v. Norris*, 64 F.3d 1178, 1181 (8th Cir.1995) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 289, 102 L.Ed.2d 265 (1988). Yet, there is one important excep-

tion to this rule: retrial is barred if we find that the evidence was legally insufficient. *Id.; Woodall v. U.S.,* 72 F.3d 77, 78 (8th Cir.1995). However, it is not even necessary to discuss the issue.

[¶ 57.] Frazier's conviction has been reversed for a constitutional evidentiary error, a classic example of "trial error" that does not trigger the double jeopardy prohibition. *See Jacob v. Clarke,* 52 F.3d 178, 180 (8th Cir.1995). "It is undisputed that the Double Jeopardy Clause does not bar retrial after appellate reversal for trial error." *Satter v. Leapley,* 977 F.2d 1259, 1263 (8th Cir.1992). This line of cases does not require us to consider the sufficiency of the evidence and I respectfully submit that it is of no benefit to the bench or bar to do so. The discussion of the sufficiency of the evidence should be completely omitted.

### [¶ 58.] 2. JURY INSTRUCTION ON FLIGHT OR CONCEALMENT.

[¶ 59.] I concur with the majority opinion that it was error to give a flight instruction on these facts. Instructions on flight should be cautiously applied. *State v. Menard,* 424 N.W.2d 382, 384 (S.D.1988). The simple act of leaving the scene of a crime does not satisfy the requirements necessary to warrant a flight instruction. There must be something more. An affirmative act to avoid apprehension is required to permit such an instruction. *State v. Hutchinson,* 139 N.C.App. 132, 532 S.E.2d 569, 574 (2000); *Mitchell v. State,* 876 P.2d 682, 685 (Okl.Crim.App. 1994).

[¶ 60.] The majority opinion concludes that this instruction did not affect the verdict and therefore Frazier suffered no prejudice. Yet, this jury instruction empowered the jury to consider evidence of this nonexistent flight to prove "consciousness of guilt." The constitutionally and statutorily mandated instructions on the

"presumption of innocence" and "proof beyond a reasonable doubt" that the majority opinion relies upon to offset the prejudice of these errors in effect proves the point. This errant instruction cannot be viewed as harmless when it highlighted to the jury evidence which was improperly categorized and presented as evidence of guilt. In fact, the defect in giving an improper "flight" instruction is that it improperly relieves the State of the burden to prove guilt "beyond a reasonable doubt" and throws out the "presumption of innocence." We have recently unanimously reversed under somewhat similar "downplaying" of these two key instructions.[13] *State v. Nelson,* 1998 SD 124, ¶ 20, 587 N.W.2d 439, 447.

[¶ 61.] The force behind our statement that these instructions should be used sparingly is suspect under the majority opinion. By refusing to find reversible error in this instance, perhaps the most egregious example of the improper use of a flight instruction, we are tacitly approving the use of such instructions throughout the state. In light of the apparent unanimous agreement of this Court that Frazier's conduct does not constitute flight, this proposition seems remarkable. I refuse to join the majority opinion's failure to find harmful error, despite its recognition that "[t]o endorse the use of a flight instruction every time a defendant leaves the scene of a crime would contradict the warning we issued in *Menard,* that the instruction should be used 'sparingly.' Indeed, the instruction would become part of nearly every criminal trial except where the accused was apprehended at the scene." This strongly worded warning constitutes a mere suggestion if we encourage this reworked instruction on flight.

### [¶ 62.] 3. CUMULATIVE IMPACT.

[¶ 63.] The majority opinion fails to appreciate the cumulative effect of these errors and their resulting prejudice which

---

13. In *Nelson,* we reversed and remanded for a new trial when the trial court failed to include and repeat the instructions on "proof beyond

a reasonable doubt" and the "presumption of innocence" at the end of the case. The facts of this case are even more egregious.

affected the fairness of Frazier's trial. "We have previously held that the cumulative effect of errors by the trial court may support a finding by the reviewing court of a denial of the constitutional right to a fair trial." *State v. Davi*, 504 N.W.2d 844, 857 (S.D.1993); *McDowell v. Solem*, 447 N.W.2d 646, 651 (S.D.1989). Moreover, this Court may address a constitutional issue sua sponte. *State v. Beck*, 2000 SD 141, ¶ 15, 619 N.W.2d 247.

[¶ 64.] We have recognized that a "snowball effect" of the errors at trial may deprive a defendant of a fair trial. *Jenner v. Leapley*, 521 N.W.2d 422, 432 (S.D.1994). How can one agree with the majority opinion that the errors at trial were nonprejudicial. The cumulative effect of the errors which occurred during Frazier's trial denied her right to a fair trial. *See State v. Jahnke*, 353 N.W.2d 606, 611 (Minn.App. 1984) (reversing Jahnke's conviction and remanding for a new trial based on prosecutorial misconduct).

[¶ 65.] Viewing the errors at Frazier's trial in isolation may lead some to conclude that they were not sufficiently prejudicial, yet that is not the consideration. "Our system of criminal justice is founded on the twin cornerstones of fairness and proof beyond a reasonable doubt." *Dillon v. State*, 311 Ark. 529, 844 S.W.2d 944, 949 (Ark1993). The Supreme Court of Arkansas correctly characterized the majority opinion's fallacy:

> It might be that alone the discrepancies in this case would not amount to prejudicial error. However, when considered together, we must conclude that the almost total disregard of the Rules cannot be ignored. What it all comes down to is where do we draw the line? We draw the line here.

*Id.* at 948.

[¶ 66.] In summary, the errors that occurred at trial, viewed cumulatively, denied Frazier her right to a fair trial as required by our constitutions. To jealously guard the integrity of our judicial system, a new trial is required. Two significant errors stand out. Frazier was denied the ability to contest the out-of-court accusations made by a man on the run from the law, in violation of her constitutional right to confront her accuser. Additionally, the jury was allowed to improperly consider the fact that she left the scene of the crime as "consciousness of guilt." The majority opinion recognizes both as clear error.

[¶ 67.] The circuit court sentenced Frazier to life imprisonment for her passive participation in the "kidnapping" and murder of Standing Bear. In every case, we are mindful of the impact a sentence can impose on all parties involved. However, we must insure that every protection that the law can muster is utilized to achieve the integrity of our judicial system. Such protections are not intended to impede the call of justice. Instead, such protections are designed to insure that each citizen is given the opportunity to contest the charges brought against them. As Frazier's conviction does not meet this rigorous standard, I dissent.

[¶ 68.] Therefore, I would reverse and remand for a new fair trial and eliminate entirely the unnecessary discussion of the sufficiency of the evidence.

[¶ 69.] AMUNDSON, Justice, joins this special writing.