2002 SD 66

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Dawn FRAZIER, Defendant and Appellant.**

No. 22024.

Supreme Court of South Dakota.

Considered on Briefs April 22, 2002.

Decided June 5, 2002.

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for plaintiff and appellee.

Bruce A. Hubbard of Hansen & Hubbard, Sturgis, for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] Dawn Frazier (Frazier) was convicted by a jury for the kidnapping and felony murder of Morning Star Standing Bear (Standing Bear). She was sentenced to life imprisonment. Frazier now appeals the conviction and the sentence. We affirm.

### FACTS AND PROCEDURE[1]

[¶ 2.] On June 15, 1999, Frazier, Chaske White (White), Robert Horse, and Jerry Horse were partying at a friend's home in Rapid City. During the course of

---

1. For a more detailed description of the facts underlying this case, *see State v. Frazier (Frazier I)*, 2001 SD 19, 622 N.W.2d 246.

the evening, they left the house and went to a bar. While at the bar, Jerry Horse picked up Standing Bear, a young woman with whom he was acquainted. When the bar closed, Standing Bear accompanied the group back to the friend's home to drink more beer. Standing Bear was visibly intoxicated at this point and passed out on the couch for a short time. Eventually, Frazier, White, Robert Horse, Jerry Horse and Standing Bear all left the house in Frazier's vehicle.

[¶ 3.] After dropping Jerry Horse off at his home, the remaining four continued to drive around the area of north Rapid City while White and Robert Horse joked about killing Standing Bear. By this time, Standing Bear was nearly unconscious.[2] Ultimately, the group stopped on a gravel road outside Rapid City where Standing Bear was forcibly removed from the car by White and Robert Horse. She was kicked, beaten and stabbed numerous times. Standing Bear died as a result of injuries inflicted, in part, by a car jack and a broken beer bottle. Her naked body was dragged into a ditch, where it was discovered the next morning.

[¶ 4.] On the evening of June 17, 1999, Frazier was interviewed five times.[3] During the final interview,[4] Frazier gave a detailed description of what had happened during the early morning hours of June 17, 1999. She claimed that White directed her where to drive. Frazier said she repeatedly requested to go home, but White refused. She believed Robert Horse, and possibly White, were "just going to" rape Standing Bear. White instructed Frazier to stop the car on Meade County Road 11L where Standing Bear was killed. Frazier claimed that White ordered her to stay in the car and not to watch what White and Robert Horse were doing. She stated that while looking in the rear view mirror, she witnessed White and Robert Horse beating Standing Bear. Frazier got out of the car on a number of occasions, once to open the trunk of her car, several times to urge White and Robert Horse to "hurry up," and each time returning to the car upon threats from White. Every time she left the car, she witnessed further beating, but according to her statement, she did not actually participate. Finally, after Standing Bear's lifeless body was dragged across the road into a ditch, Frazier drove White and Robert Horse back into Rapid City.

[¶ 5.] At trial, Frazier claimed she was a victim of Battered Woman's Syndrome and she obeyed White only out of fear for her safety. While their relationship had started well, White began drinking and hitting her with his fist. Frazier testified that White had beat, raped, and sodomized her to the point where, on at least one occasion, she had to go to the emergency room. White was charged with simple assault as a result of that beating, but was released when Frazier recanted. Two of Frazier's co-workers and Frazier's cousin all testified to White's abuse of Frazier and her fear of him. White's ex-girlfriend testified that she had experienced the same treatment from White when she was

---

**2.** Standing Bear's blood alcohol content at the time of her death was 0.342 grams per deciliter.

**3.** Only the third and fifth interviews were tape-recorded.

**4.** Before the final interview of Frazier, she told investigators that she was afraid of White and his possible retaliation against her or her family. To ease Frazier's fears and support the assertion that White would be incarcerated for his participation, it was arranged for White to be escorted in handcuffs past the open door of the room where Frazier was being questioned.

with him. Carol Maicki (Maicki), a consultant in the field of Battered Woman's Syndrome, testified to its symptoms, many of which matched Frasier's behavior. Maicki was not, however, familiar with the specific facts of this case.

[¶ 6.] On June 14, 2000, the jury convicted Frazier of both kidnapping and felony murder. The circuit court sentenced her to life imprisonment on both counts with sentences to run concurrently.[5] Frazier appealed the conviction and sentence. On March 29, 2000, this Court reversed the conviction on the basis that the trial court had erroneously admitted the unreliable statements of Jerry Horse, a fugitive at the time of trial, in violation of the confrontation clause. *See Frazier I,* 2001 SD 19 at ¶ 33, 622 N.W.2d at 259.

[¶ 7.] Frazier was retried June 4 through June 15, 2001, and was found guilty of the kidnapping and felony murder of Standing Bear. She was again sentenced to life imprisonment. Frazier now appeals both the conviction and the sentence, raising the following issues:

1. Whether the evidence was sufficient to sustain a jury verdict of guilty on the kidnapping and felony murder charges.

2. Whether South Dakota's felony murder statute is unconstitutional.

## STANDARD OF REVIEW

[¶ 8.] We review a motion for judgment of acquittal by deciding "whether [the] State set forth sufficient evidence from which the jury could reasonably find the defendant guilty of the crime charged."

*State v. Holzer,* 2000 SD 75, ¶ 10, 611 N.W.2d 647, 650.

In determining the sufficiency of the evidence on review, the question presented is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In this review, we must accept that evidence, and the most favorable inferences to be fairly drawn therefrom, which will support the verdict. In determining the sufficiency of the evidence, this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt.

*State v. Buchholz,* 1999 SD 110, ¶ 33, 598 N.W.2d 899, 905 (quoting *State v. Knecht,* 1997 SD 53, ¶ 22, 563 N.W.2d 413, 421).

[¶ 9.] We review constitutional claims *de novo. City of Pierre v. Blackwell,* 2001 SD 127, ¶ 7, 635 N.W.2d 581, 584 (citation omitted).

## ANALYSIS AND DECISION

[¶ 10.] **1. Whether the evidence was sufficient to sustain a jury verdict of guilty on the kidnapping and felony murder charges.**

[¶ 11.] Frazier contends that the evidence in this case was insufficient to sustain the jury's verdict. Essentially, Frazier argues that the evidence relating to her alleged fear of White and her suf-

---

5. White pled guilty to first degree murder and kidnapping. In exchange, the State agreed not to seek the death penalty. He was sentenced to life imprisonment on each charge with the sentences to run consecutively. Robert Horse was convicted of first degree murder and kidnapping by a jury and sentenced to life imprisonment on each conviction. His conviction was reversed by this Court in *State v. Horse,* 2002 SD 47, 644 N.W.2d 211 on grounds that waiver of his Fifth Amendment rights had not been freely and voluntarily given.

fering from Battered Woman's Syndrome, outweighs the evidence that she not only facilitated the crime by driving Standing Bear to her death, but also that she may have actively participated in the crime. We disagree.

[¶ 12.] Frazier was convicted of kidnapping in violation of SDCL 22–19–1, which provides, in relevant part:

Any person who shall seize, confine, inveigle, decoy, abduct or carry away any person and hold or detain such person, except in the case of an unmarried minor by a parent thereof, for any of the following reasons: ... (2) To facilitate the commission of any felony or flight thereafter; (3) To inflict bodily injury on or to terrorize the victim or another; ... is guilty of kidnapping. Kidnapping is a Class 1 felony, except if the person has inflicted a gross permanent physical injury on the victim, in which case it is a Class A felony.

In addition, Frazier was convicted of felony murder pursuant to SDCL 22–16–4, which provides, "[h]omicide is murder in the first degree when ... committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, [or] kidnapping ...." Therefore, we first determine whether the evidence supports the kidnapping conviction.

[¶ 13.] Frazier drove her car to the secluded area where Standing Bear was killed. She likely overheard White's and Robert Horse's jokes about killing Standing Bear. Frazier had ample opportunity to stop driving or turn the car around. In her statement to law enforcement and in her brief, Frazier concedes she "suspected that Standing Bear was going to be raped." Evidence suggested that the beating may have lasted more than twenty minutes. Yet, Frazier did not sound the horn to attract help from the nearby farm house or try to leave the scene. In fact, Frazier retrieved items from the trunk of her car for White and Robert Horse to use in the beating. She may even have actively participated by throwing the tire jack at Standing Bear's body and by kicking her.[6]

[¶ 14.] After Standing Bear's body was dragged into the ditch, Frazier helped clean up the crime scene. She offered a bag to put the bloody clothes in, refused to put Standing Bear's body in the trunk of her car, and admonished White and Robert Horse not to touch anything with their bloody hands. Then she drove White and Robert Horse back to Rapid City, where she fell asleep on a couch with White. Later, she drove Robert Horse to his house to change clothes. When the group met Jerry Horse for breakfast, White told Jerry Horse "we killed Morning Star." Jerry Horse asked Frazier whether it was true and Frazier "just shook her head yes." Frazier went to work the next two days and was safely away from White, but she did not report the crime. The jury could reasonably have believed that these were not the actions of someone who only

6. When questioned by police, White claimed Frazier had actively participated in the murder. White stated: (1) "... and Dawn fucking threw a kick in too;" (2) "... and like, Dawn was hitting her with that thing (the jack) ...;" (3) "Dawn went and got the lug wrench out;" and (4) "Dawn pulled [a malt liquor bottle] out from somewhere. She goes, 'use this,' then she broke it and then she handed it to me." White also stated that he cut his hand on the bottle when Frazier handed it to him and that Frazier helped drag Standing Bear's body across the road. At trial, White claimed his statements regarding Frazier's active involvement were all lies. However, Robert Horse, in his statement to police, told the same story of Frazier's involvement. In either case, the jury could reasonably have believed that Frazier did more than merely sit in the car as White had supposedly ordered her to do.

"obeyed" out of fear. Frazier has failed to show, in light of all the evidence, that no reasonable jury could have found her guilty of kidnapping.

[¶ 15.] It is undisputed that Standing Bear died as a result of the actions of Frazier, White and Robert Horse. We have concluded the evidence is sufficient to affirm the trial court's ruling as to the charge of kidnapping. Accordingly, we must also conclude the evidence is sufficient to support the trial court's ruling on the felony murder charge, because Standing Bear died during the perpetration of a kidnapping. The evidence, as well as the inferences fairly drawn therefrom, adequately support the trial court's denial of Frazier's motion for acquittal on both charges.

[¶ 16.] **2. Whether South Dakota's felony murder statute is unconstitutional.**

[¶ 17.] Frazier argues that SDCL 22–16–4 is unconstitutional for two reasons. First, she claims that because she merely drove the car that carried away Standing Bear and "had no specific intent to kill anyone," the mandatory sentence of life imprisonment is grossly disproportionate to her role in the crime. Second, Frazier contends that South Dakota's felony murder statute impermissibly allows a conviction for first degree murder without the requisite premeditation. As a result, Frazier asserts that South Dakota's felony murder statute violates the Eighth Amendment prohibition against cruel and unusual punishment. We disagree.

[¶ 18.] SDCL 22–16–4 provides, in pertinent part:

> Homicide is murder in the first degree ... when committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throw-

ing, placing, or discharging of a destructive device or explosive. Homicide is also murder in the first degree if committed by a person who perpetrated, or who attempted to perpetrate, any arson, rape, robbery, burglary, kidnapping ... and who subsequently effects the death of any victim of such crime to prevent detection or prosecution of the crime.

First degree murder is a class A felony, punishable only by life imprisonment or the death penalty. SDCL 22–16–12; SDCL 22–6–1(1). Thus, because the State did not seek the death penalty in this case, a life sentence was mandatory. But such mandatory sentences, regardless of any mitigating evidence, are not necessarily unconstitutional. *See Harmelin v. Michigan*, 501 U.S. 957, 994–99, 1006–08, 111 S.Ct. 2680, 2701–03, 2707–09, 115 L.Ed.2d 836, 864–65, 872–74 (1991).

[¶ 19.] The Eighth Amendment states, "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." This guarantee protects against unnecessarily painful and barbarous punishments, as well as those that are grossly disproportionate to the crime. *See Harmelin*, 501 U.S. at 996–98, 111 S.Ct. at 2702–03, 115 L.Ed.2d at 866–67 (Kennedy, J., concurring); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642–43, (1958). A proportionality challenge, however, should rarely be successful in cases where the death penalty is not at issue. *See Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382, 390 (1980).

[¶ 20.] Proportionality review involves five basic principles. First, "the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not

courts." *Harmelin,* 501 U.S. at 998, 111 S.Ct. at 2703, 115 L.Ed.2d at 867 (Kennedy, J., concurring). Second, "the Eighth Amendment does not mandate adoption of any one penological theory." *Id.* at 999, 111 S.Ct. at 2704, 115 L.Ed.2d at 867. Third, it is the unique and independent role of the state to define societal norms through legislative enactments in criminal law. The state's power "may yield different, yet rational, conclusions regarding the appropriate length of prison terms for particular crimes." *Id.* at 1000, 111 S.Ct. at 2704, 115 L.Ed.2d at 868. Fourth, proportionality review is driven by objective factors. *Id.* Finally, "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only *extreme* sentences that are grossly disproportionate to the crime." *Id.* at 1001, 111 S.Ct. at 2705, 115 L.Ed.2d at 869 (emphasis added). Thus, as a reviewing court, we must give substantial deference to the Legislature's choice in fixing criminal penalties and we must determine only whether such a choice is grossly disproportionate to the crime involved. *See State v. Milk,* 2000 SD 28, ¶ 14, 607 N.W.2d 14, 18 (applying *Harmelin* principles to uphold life sentence for defendant convicted of first degree manslaughter); *State v. Bonner,* 1998 SD 30, ¶ 14, 577 N.W.2d 575, 579 (noting reviewing courts should give substantial deference to legislatures in determining types and limits of punishments). *See also Phillips v. State,* 807 So.2d 713, 717 (Fla.App. 2002) (applying five principles of proportionality review and holding sentence of life imprisonment for 14–year–old boy who killed 8–year–old girl not unconstitutional).

▬ [¶ 21.] Courts have generally upheld the constitutionality of felony murder statutes. *See, e.g., Simpson v. Lockhart,* 942 F.2d 493 (8thCir.1991) (upholding Arkansas felony murder statute); *State v.*

*Murphy,* 91 Ohio St.3d 516, 747 N.E.2d 765 (2001) (upholding death penalty in robbery-murder case even though defendant did not intend to kill anyone); *People v. Musselwhite,* 17 Cal.4th 1216, 74 Cal. Rptr.2d 212, 954 P.2d 475 (1998) (holding no Eighth Amendment requirement that felony murder statute apply only to premeditated and deliberate murders); *People v. Cisneros,* 855 P.2d 822 (Colo.1993) (upholding automatic sentence of life imprisonment for felony murder); *State v. Dixon,* 237 Neb. 630, 467 N.W.2d 397 (1991) (denying claim that felony murder statute allows cruel and unusual punishment without requisite intent to kill); *State v. Gilmer,* 96 Wash.App. 875, 981 P.2d 902 (1999) (holding felony murder statute may be harsh but not unconstitutional). "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin,* 501 U.S. at 994–95, 111 S.Ct. at 2701, 115 L.Ed.2d at 864.

▬ [¶ 22.] Frazier's reliance on the United States Supreme Court decision of *Solem v. Helm* is misguided. 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). In that case, the defendant was sentenced to life imprisonment for passing a $100 "no account" check, his seventh non-violent felony, under the South Dakota recidivist statute. *Id.* at 281–82, 103 S.Ct. at 3005, 77 L.Ed.2d at 643–44. The Supreme Court made a point of recognizing that ordinarily, the maximum sentence for this crime would have been five years. It also noted that none of the defendant's previous felonies had been violent crimes and none had been crimes against a person. *Id.* at 280, 103 S.Ct. at 3005, 77 L.Ed.2d at 643. The Supreme Court held that the punishment in that case was grossly disproportionate to the defendant's crime.

[¶ 23.] Instead, we find the United States Supreme Court case of *Tison v. Arizona* to be more directly controlling. 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). There, the Supreme Court examined the Arizona felony murder statute in the context of four murders, which occurred during a prison escape, armed robbery, theft of an automobile and kidnapping. The two individuals appealing their case participated in the underlying crimes, made the murders possible by helping their father break out of prison, and were present when the victims were shot. *Id.* at 151–52, 107 S.Ct. at 1684–85, 95 L.Ed.2d at 140–41. They did not, however, actually kill or intend to kill the victims. *Id.* The Supreme Court noted:

> Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery [sic] and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight. The [defendants'] high level of participation in these crimes further implicates them in the resulting deaths.

*Id.* at 158, 107 S.Ct. at 1688, 95 L.Ed.2d at 144. The Supreme Court noted there is, among the majority of jurisdictions,[7] an "apparent consensus that substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty even absent an intent to kill." *Id.* at 154–55, 107 S.Ct. at 1686–87, 95 L.Ed.2d at 142 (citations omitted). The Supreme Court went on to hold that specific intent was not required in order to satisfy Eighth Amendment analysis because "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158, 107 S.Ct. at 1688, 95 L.Ed.2d at 145 (citing *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)).

[¶ 24.] While Frazier would like to characterize her role in this crime as "merely driving the car," the evidence suggests otherwise. Unlike *Solem*, this case involves two violent crimes committed against another person: kidnapping and murder. As in *Tison*, Frazier's actions made the murder possible. She was not "merely" a driver for the other felons; she aided them in concealing the crime and may even have actively participated in its perpetration. Whether Frazier did not intend for Standing Bear to die is not determinative. As noted by Justice Kennedy in *Harmelin*, "the crime of felony murder without specific intent to kill ... [is] a crime for which 'no sentence of imprisonment would be disproportionate.'" 501 U.S. at 1004, 111 S.Ct. at 2706, 115 L.Ed.2d at 871 (Kennedy, J., concurring) (quoting *Solem*, 463 U.S. at 290, n.15, 103 S.Ct. at 3009, 77 L.Ed.2d at 649) (additional citation omitted). Thus, we conclude Frazier's sentence is neither grossly dis-

---

7. The Supreme Court examined the felony murder rule of various jurisdictions and concluded, contrary to Frazier's assertion, that the majority of them actually authorize the death penalty, even without a finding of intent to kill. "This substantial and recent legislative authorization of the death penalty for the crime of felony murder regardless of the absence of a finding of an intent to kill powerfully suggests that our society does *not* reject the death penalty as grossly excessive under these circumstances." *Tison*, 481 U.S. at 154, 107 S.Ct. at 1686, 95 L.Ed.2d at 142. If the death penalty in such cases is not grossly disproportionate, then certainly a sentence of life imprisonment must pass proportionality analysis, as well.

proportionate to her crime, nor violative of the Eighth Amendment prohibition against cruel and unusual punishment.

[¶ 25.] We affirm.

[¶ 26.] · SABERS, AMUNDSON, KONENKAMP, and ZINTER, Justices, concur.